SOUTHERN KANSAS RY. CO. OF TEXAS
v. LOGUE.†

(Court of Civil Appeals of Texas. San Antonio. June 21, 1911. Rehearing Denied July 1, 1911.)

1. CORPORATIONS (§ 398*)—CONTRACTS—OFFICERS—STATUTES.

Under Rev. St. 1895, arts. 661, 662, 4386, giving directors general management of corporate affairs, requiring them to keep a record of their business transactions, and vesting in boards of directors the corporate powers of railroad corporations, no corporate power may be exercised by any one except the board of directors, or by an agent specially empowered by the board to act for them, and an officer of the board may not bind the corporation by virtue of his position, but there must be action by the board either in performing the act or authorizing its performance, and such authority may be inferred from the surrounding circumstances.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1593; Dec. Dig. § 398.*]

2. CORPORATIONS (§ 314*)—POWERS OF DIRECTORS—CONTRACTS.

A director of a railroad company, empowered to obtain a right of way for the company, has no authority to obtain a right of way from himself by binding the company to perpetually maintain a depot and line of railway in a designated place.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1393; Dec. Dig. § 314.*]

3. CORPORATIONS (§ 399*)—CONTRACTS—POWERS OF AGENTS.

A corporation is bound by oral or written contracts made by its authorized agents legally empowered to make contracts, within the scope of the powers of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1588; Dec. Dig. § 399.*]

4. CORPORATIONS (§ 398*)—CONTRACTS—POWERS OF AGENTS.

In the absence of any authority of any agent of a corporation to bind it by contract, a contract purporting to perpetually bind the corporation to perform a specified act is not binding on it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1592–1594; Dec. Dig. § 398.*]

5. CORPORATIONS (§ 426*)—CONTRACTS—VALIDITY.

Where an owner, conveying land to a railroad company for a right of way and depot grounds, did not know the officers with whom he made a contract binding the company to perpetually maintain a depot and a line of road at a designated place, the mere fact that the company used the property acquired in the absence of affirmative evidence that it knew of the contract, did not render the contract binding on it though the owner was a promoter of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1716; Dec. Dig. § 426.*]

6. RAILROADS (§ 129*)—SALES—LIABILITIES OF PURCHASERS.

A railroad company purchasing, as authorized by law, the property of another railroad corporation is not charged with notice of the existence of any contract binding the latter company to perpetually maintain its depot and line in a designated place, where the contract was not of record, and was not shown by the books of the company or the minutes of its board of directors.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 399–403; Dec. Dig. § 129.*]

Appeal from District Court, Armstrong County; S. P. Huff, Judge.

Action by James Logue against the Southern Kansas Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Terry, Cavin & Mills, Madden, Trulove & Kimbrough, and F. M. Ryburn, for appellant. R. E. Carswell and R. R. Hazlewood, for appellee.

FLY, J. Appellee sued appellant for damages alleged to have accrued to him by reason of the depreciation in value of town lots

and lands in and near the town of Washburn, in Armstrong county, Tex., the depreciation arising from the act of appellant in taking up its rails and discontinuing its road between Panhandle, in Carson county, and Washburn, and the construction of its road direct from Panhandle to Amarillo, leaving Washburn six miles off its line. It was alleged that in 1887 R. E. Montgomery was in possession of four sections of land, numbers 62, 63, 98, and 99, which lay in such contiguity to each other as to substantially form a square, and a right of way was granted the Ft. Worth & Denver Railway Company across said sections together with a depot ground about the center of the square, and also there was donated to the said railway company about 100 acres out of said square, the consideration being that the railway company would establish on said land its depot, which was done and the station called Washburn, that afterwards the Panhandle Railway Company was incorporated to build a railroad from a point at or near Washburn, in a northeasterly direction to Panhandle, the charter thereof providing that it would establish and maintain its principal offices at Washburn, that said railway company entered into an agreement with Montgomery by which in consideration of the grant of right of way and depot grounds, it agreed to forever maintain its road, depot, and principal offices at Washburn; that the right of way and depot grounds were taken possession of, the road was constructed, and the depot established, and the same were used and occupied until the same was purchased by appellant under and by authority of an act of the Twenty-Sixth Legislature, in 1899 (Acts 26th Leg. c. 25), and the same was taken possession of by appellant and operated as a part of its line until about April, 1898, when appellant wrongfully and willfully took up and removed its tracks from Panhandle to Washburn, and ceased to operate that part of its line, and permanently abandoned and discontinued the same. By the pleadings appellant was charged with knowledge of the contract of the Panhandle Railroad, but disregarded the rights of appellee which were obtained by his purchase on December 1, 1906, by all of the four sections of land owned at that time by Montgomery, together with all the covenants, rights, privileges and appurtenances belonging or appertaining to the same, that when Montgomery laid off and platted the town of Washburn he included about 600 acres, consisting of about 5,000 lots, and published a map and plat which showed the donations to the Panhandle Railway Company, and that it was replatted by appellee, who owned 1,603 acres of land out of the four sections, in addition to 5,388 lots as shown by the map of Washburn; that said lots were worth, prior to the removal of the railroad, $30 each, and the acreage property $40 an acre, but by the removal the lots were reduced in value to $15

each and the acreage property to $20 an acre, the total depreciation being $112,970.

Appellant answered by general and special demurrers, general denial, and special pleas, which gave a history of the default of the Panhandle Railway Company in the payment of certain bonds, the foreclosure of a mortgage, a sale of the road and its properties and franchises to Edward Welder, and his sale on January 1, 1900, to appellant by virtue of the authority of an act of March, 1899, of the Legislature of Texas. It was further answered that by an act of the Legislature, of date March 26, 1907, appellant had been authorized to take up and abandon its track and road from Washburn to Panhandle, and a plea of limitations was also filed.

The salient facts are: That sections 62, 63, 98, and 99 are located near the northwest corner of Armstrong county, and form a square, 62 being the northwest quarter, 63 the northeast quarter, 98 the southeast quarter and 99 the southwest quarter of the square. The Ft. Worth & Denver Railway Company's line enters the square near the northeast corner of 98, runs across the southwest corner of 63 and across the south half of 62. The Panhandle road ran in a southwesterly direction from Panhandle across section 63 a short distance into section 98 where it formed a junction, at Washburn, with the Ft. Worth & Denver City Railway Company's line. R. E. Montgomery on February 10, 1888, acquired title to 98, except 40 acres, on May 3, 1890, obtained title to sections 63 and 99. Montgomery on December 31, 1891, conveyed to the Ft. Worth & Denver City Railway Company a right of way 200 feet wide across sections 62, 63 and 98, the consideration being two dollars, and on May 7, 1897, he conveyed all of sections 63, 98, and 99 not previously conveyed to the Panhandle Townsite Company, and that company, through Montgomery as its president, on December 1, 1906, conveyed to appellee, James Logue, for a recited consideration of $9,000 cash and three notes for $9,000, all of section 98 not previously sold, except the east one-half of the south-east quarter, 80 acres, and all of section 99, that had not been sold as lots and blocks, and all of section 63 that had not been sold as lots and blocks, and except "any right which the Ft. Worth and Denver City Railway Company or the Southern Kansas Railway Company of Texas may have to their right of way through said land." The Panhandle Railway Company was chartered in 1887 by R. E. Montgomery and others, and the charter provided that the principal business office should be maintained at Washburn. The road was constructed as hereinbefore indicated across section 63 from Washburn to Panhandle, and on July 1, 1889, the company executed and delivered to the Central Trust Company of New York a mortgage or trust deed on all of its properties and franchises, to secure the payment of certain bonds, and having made default in payment,

in 1898 a suit was instituted by the Trust Company, in the Circuit Court of the United States for the Northern District of Texas, and judgment was rendered and the lien regularly foreclosed on the property described in the mortgage, and the same was regularly sold to Edward Wilder and the sale confirmed by the court. On December 5, 1898, the deed to Wilder was executed by Thomas P. Martin, Special Master in Chancery appointed by the federal court. While the property was held by Wilder the Legislature of Texas passed an act authorizing appellant to purchase the road and to operate it as a part of its line. Acting under that legislative authority, on January 1, 1900, Wilder conveyed the Panhandle Railway to appellant. The general offices of appellant were first located at Ft. Worth, were then legally removed to Panhandle City, Carson county, Tex., then on November 9, 1899, it moved its general offices to Amarillo in Potter county, Tex. The Legislature of Texas, in 1907, authorized appellant to abandon its track between Panhandle and Washburn, and to build its line southwest to Amarillo. Before the latter line was constructed appellant had run its trains to Washburn and thence to Amarillo over the line of the Ft. Worth & Denver City Railway Company. In the act authorizing the abandonment of the line between Panhandle and Washburn it was provided: "The enactment of this law shall not preclude any person, who may have a legal cause of action against the said Southern Kansas Railway Company for damages, if any, occasioned by reason of taking up and destruction of said track, from prosecuting said cause of action in the proper courts having jurisdiction thereof." In 1908 appellant, having constructed its direct line from Panhandle to Amarillo, tore up its track between Panhandle and Washburn and abandoned its right of way. Appellee bought the land in 1906, after he knew that appellant intended to tear up its track and abandon the road.

Montgomery swore that there was an agreement between the officers of the Santa Fé Railway Company, of which appellant is a part, and officers of the Ft. Worth & Denver City Railway Company, that the latter should build the Panhandle Railroad and that it should be turned over to the Santa Fé Road as soon as it could pay for the road. He stated that he did not remember the names of the officers of the Santa Fé that made the agreement, but thought that it was Strong, president, or Robinson, engineer, and that Mr. Manvell, who succeeded Strong as president of the Santa Fé, recognized it. The uncontroverted testimony of five witnesses showed that the Atchison, Topeka & Santa Fé Railroad property was sold at foreclosure sale on December 10, 1895; that a new company was chartered on December 12, 1895, and took the property and began business on January 1, 1896; that since the reorganization Ripley has at all times been its president, and that Strong, Manvell and Robinson have never had any official connection with the reorganized company, and that none of the officials of the new company ever knew or heard of the agreement testified to by Montgomery.

Montgomery swore that he donated depot grounds and right of way—about 154 acres—to the Ft. Worth & Denver and the Panhandle Roads and "the consideration was the building, establishment, and maintenance of both railways, with their depots and stations on my land, both companies taking possession of the land so donated and using it as they desired for railway purposes." He made a deed to the land donated to the Ft. Worth & Denver Road, but gave no deed to the Panhandle Road. He further testified: "I was one of the incorporators of the Panhandle Railway and a stockholder and director of the company, and its charter provided that its railway should be built over my land, its depot erected, located, and maintained thereon, and that its principal office should be and remain there forever, and that was the understanding and agreement between us. I can't tell what officers I had this agreement with as to the establishment and maintenance of the general offices of the building of the road, or the establishment of its station and depot on my land, but think it was with the president, who, I think was J. P. Smith, Morgan Jones, and probably some of the other officers of the company named in the charter, but I do know that my agreement with them was that this road, with its depot, station, and principal place of business should remain on the land that I donated forever, and I would not have donated this land for any other purpose, except a permanent one." J. P. Smith was dead at time of the trial, but Morgan Jones swore: "There was no understanding or agreement with any one with respect to the location of the general offices of said company at Washburn, the place named in said charter. The law requires the general offices to be located at a place on the line of its railroad, and we selected that point on the line for the reason that it was the junction point with the Ft. Worth & Denver City Railway. My recollection is that there was no discussion among the stockholders or directors with respect to the location of the general offices of said company at Washburn. I determined that that was the place to locate them and had the charter drawn that way. The Panhandle Railway Company, its board of directors or myself never entered into a contract with R. E. Montgomery, or any one else, by which it was agreed to establish and forever maintain the line of railway of the Panhandle Railway Company and depot of said company, or the general offices of said company, or any of them, at Washburn, in Armstrong county, Tex. I have heretofore stated that no such agreement was ever made, as referred to herein. I have heretofore stated that

there was no agreement between either the Panhandle Railway Company or any of its directors or stockholders with R. E. Montgomery, in which it was agreed that the general offices of the company should be perpetually maintained at Washburn. I have never heard of such an agreement until I heard of it being asserted in this case that such an agreement existed. The board of directors of the Panhandle Railway Company was composed of the persons named in the charter; my recollection is that I was president of said company at that time. If I was not, I was first vice president and general manager, and was in charge of the property. I never did make or enter into any such agreement or understanding with R. E. Montgomery. If J. P. Smith, or any other officer or director of the company entered into such an agreement, it was unknown to me. Mr. Smith was really only a nominal director, and had no authority to make such an agreement. No one other than the board of directors of said company had the authority, under the charter and by-laws of the Panhandle Railway Company, to have made such an agreement. No officer or officers aside from the board of directors had the authority to make such a contract with Montgomery, or any one else. J. P. Smith was not vested with authority to make such a contract." The board of directors at the time the agreement with Montgomery was claimed to have been made consisted of Morgan Jones, K. M. Van Zandt, J. P. Smith, A. B. Smith, R. E. Montgomery, J. M. O'Neall, David Felsenheld, Henry Walters, A. J. Mayer, and J. T. Granger. Of the number the two Smiths and Felsenheld were dead at time of the trial; O'Neall resided in California; Walters and Mayer in New York City; and Granger in Washington City; and only Van Zandt, Jones, and Montgomery testified in the case. The two former flatly contradicted the latter as to any agreement as to the permanent location of the right of way and depot grounds. The charter required the principal office of the Panhandle Road to be located at Washburn, but of course the charter did not require, as stated by Montgomery, that the road should be built over his land and the depot erected thereon and that they should be and remain there forever. The only evidence of such agreement was the unsupported testimony of Montgomery that he had at some time, with some person or persons, made such an agreement. Of the two persons named by him with whom he thinks to have made the contract, one is dead and the other emphatically denies ever having heard of such an agreement.

[1, 2] It is axiomatic that it takes at least two parties to enter into a contract of any character, and until that state of circumstances is shown there can be no contract. Now in this case it is the claim of Montgomery that some time in 1887 or 1888, either before or after the Panhandle Railway Company was chartered by the state of Texas, a contract was made and entered into by and between him and some one not known, for the railway company, that for and in consideration of a grant of a right of way and depot grounds on certain lands, the railway would forever maintain its track and depot on those grounds. With what officers or stockholders was that contract made and what was their authority to bind the railway company, under the law? In article 661, Rev. Stats. 1895, it is provided in regard to private corporations: "The directors or trustees shall have the general management of the affairs of the corporation, etc," and in article 662 it is required that the directors shall keep a record of all business transactions. In article 4386, "All the corporate powers of every railroad corporation shall be vested in and be exercised by its legally constituted board of directors. The statute is plain and unequivocal and no corporate power can be exercised by any one except the board of directors or by some officer or agent specially empowered by the board of directors to act in their name, place and stead. The president or vice president or one or more of the directors could not bind the corporation in the exercise of its corporate powers by virtue of the office or position held, but there must be action of the board of directors of the corporation either in performing the act or authorizing some one else to perform it. It may be that such authority may at times be inferred from the circumstances surrounding the acts, and undoubtedly the unauthorized act of some officer or agent might be ratified or confirmed by the board of directors. It is not claimed in this case that the board of directors of the Panhandle Railway Company ever contracted with Montgomery to forever keep the track and depot where they were, or that they ever authorized any one to make such a contract, in fact it is uncontradicted that no such authority was ever given, and if there ever was any such contract it must depend upon the ratification of the board of directors of the act of some one not precisely known in making the contract with Montgomery. It will not be pretended that Montgomery, the director, or the right of way agent, could make a contract with Montgomery, the real estate owner, or that he could afterwards, as director, ratify such contract. It may be admitted that Montgomery had been authorized to obtain right of way for the railway company, but that did not carry with it the authority to obtain right of way from himself by binding the company to forever maintain a depot and line of railway in a certain place. He does not claim to have made the contract with himself.

[3, 4] It is well established that "whenever a corporation is acting within the scope of the legitimate purposes of its institution, all parol contracts, made by its authorized agents, are express promises of the corporation; and all duties imposed on them by law,

and all benefits conferred at their request, raise implied promises, for the enforcement of which an action will lie," that is corporations are bound by the contracts, oral as well as written, made by their legally empowered and authorized agents, bounded and limited of course by the scope of powers of the corporation. Bank of Columbia v. Patterson, 11 U. S. 299, 3 L. Ed. 351; Wyman v. Bank, 14 Mass. 58, 7 Am. Dec. 194; Railway v. City of Sweetwater (Sup.) 137 S. W. 1117 recently decided. The basis of the proposition, however, rests on the authority of the agent, and there being no evidence whatever of any agent of the corporation herein concerned, ever being authorized to bind the corporation in the terms of the onerous contract which was limited in its application and effect not even by time, but was to last forever.

With whom was the contract made which Montgomery entered into? Montgomery does not know, for he says: "I can't tell what officers I had this agreement with, as to the establishment and maintenance of the general offices, or the building of the road, or the establishment of its station and depot on my land. * * * I do not remember who was present at the time of the making of this agreement, but think it was made by Morgan Jones or Peter Smith and in the presence of F. E. Bissell, the chief engineer who built the Ft. Worth & Denver & Panhandle Railway." And yet upon that uncertain testimony, which was absolutely contradicted by every one who testified about it, a contract is found to have existed with a railroad corporation, upon the breach of which is justified a verdict and judgment for $44,592. No effort was made to show that the corporation had authorized the making of the contract with Montgomery, and if some person had been authorized it was not proved that Montgomery contracted with that party.

If it had been clearly shown that an officer of the railroad corporation entered into the contract with Montgomery, although without authority on the part of the corporation, it might have been held to the contract if it had appeared that the board of directors knew the facts, made no objection to the contract, and acted upon it and received the benefits arising from it. Railway v. Robards, 60 Tex. 545, 48 Am. Rep. 268. No such evidence was offered.

[5] It is true that the board of directors knew that the land was that of Montgomery, that the railroad company was using it for depot and right of way purposes, and knew that it had not been bought or condemned, and this no doubt would have made the corporation liable for any damages that may have arisen from the unauthorized entry upon the land, or they may have known that Montgomery had acquiesced in the use of the land, but that could not have charged them with knowledge that some unauthorized person had bound the corporation to maintain its track and depot in the same place forever, and it was affirmatively shown no such contract was ever made known to the directors. The board of directors may have inferred that the land was donated, as Montgomery swore it was, "to promote the development of the town of Washburn," and to enhance the value of surrounding lands, but that would not put the company upon notice that a contract had been made for the permanent operation of the road and use of the depot.

It is the contention of appellee that if Montgomery was wrong as to how the right of way was acquired across his land that appellant should explain it, forgetting that appellee was the plaintiff in the case, and the burden of establishing the allegation that a certain contract was entered into by the Panhandle Railway Company rested upon him, and no duty devolved upon appellant except to meet the case made by him. It is not "wholly immaterial" either with whom Montgomery made the contract, for in order to bind appellant the party who contracted with Montgomery must have been authorized by the corporation to make the contract, and the mere fact that it received and used the right of way and depot grounds, could not make it responsible for a contract of which it had no knowledge, which bound it to forever run its road in a certain place and keep its depot on a certain spot. The evidence tends to show that Montgomery was acting as a promoter, and appellee insists that as the Panhandle Railway Company accepted the benefits of the contract, it was bound by it, and cites as his authority Railway v. Granger, 86 Tex. 350, 24 S. W. 797, 40 Am. St. Rep. 837. It was held in that case that contracts made by promoters on behalf of a corporation within the scope of its general authority, might be adopted by the corporation after its organization. In that case an attorney sued for services rendered in procuring a bonus for a projected railroad, which was afterwards built, and it was clearly held that mere acceptance of the benefit of the labor of the attorney would not bind the company. That case does not sustain the contention of appellee that the use of the right of way and depot grounds bound the Panhandle Railway Company, on a contract of which it had no knowledge, made by an unauthorized person. There can be no doubt that by an acceptance of the right of way and depot grounds the railway company became liable to pay the full value of the land accepted by it, but it could not by such acceptance be bound by an onerous contract of which it had no knowledge and which it had authorized no one to make. As said in the case cited: "The evidence does not disclose that his contract with Anderson was actually known to any other person; nor do we see any other circumstance from which knowledge should necessarily be inferred."

[6] If the Panhandle Railway Company had made the contract with Montgomery, the

same was not on record, and there was nothing to put appellant upon notice of the existence of such a contract. The mere fact that the purchased railroad was over land, which had not been condemned and paid for, or to which no deed had been given, would have merely put the purchaser upon notice that it would probably be compelled to pay for the land being used for right of way or depot purposes. If it had scanned the records it would have found nothing, if it had investigated the books of the company and the minutes of the board of directors nothing would have been disclosed. If it had inquired of the president and general manager he could have given no information. The case of Railway v. Ortiz, 75 Tex. 602, 12 S. W. 1129, relied upon by appellee, is not authority for the contention that appellant as purchaser of the road was chargeable with notice of such a contract as the one sworn to by Montgomery in regard to the right of way, but in that case it is only held that the purchaser would be liable for the value of the land, and could not escape the payment of such value by a plea of innocent purchaser. In that case Ortiz had recovered a judgment for the damages to the land, and that judgment had not been paid when the second railroad company bought the property. It was a valid claim against the old company for the right of way. The new company was properly held chargeable with the payment of that claim, which was in the shape of a judgment. That is a very different proposition from a contract which was hidden in the mind of Montgomery, and was known to no one else. These matters are discussed with an assumption that the contract really existed, but we hold that it did not and the case of Railway v. City of Sweetwater is ample authority for such holding. There was no doubt in that case of the existence of the contract between the city and the vice president of the road, who in addition to that office was one of a committee of three to whom the affairs of the railroad had been committed by its board of directors, and yet the Supreme Court held that the railroad company was not bound by the contract.

We deem it unnecessary to discuss the different assignments of error, but because no contract was proved upon which to base the judgment for damages, it is reversed and judgment here rendered that appellee take nothing by his suit and pay all costs in this behalf expended.