**Richard F. KIEPFER, M.D.,**
**Plaintiff–Appellant,**

v.

**Barry M. BELLER, Etc.,**
**et al., Defendants,**

**American Physicians Insurance**
**Exchange, Defendant–**
**Appellee.**

No. 90–5538.

United States Court of Appeals,
Fifth Circuit.

Oct. 21, 1991.

John N. Mastin, Jack N. Price, San Antonio, Tex., for plaintiff-appellant.

Kenneth L. Malone, Emerson Banack, Jr., Foster, Lewis, Langley, Frederick C. Shannon, Jr., Shannon & Weidenbach, San Antonio, Tex., for defendant-appellee.

Before JOHNSON, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge.

Richard Kiepfer, M.D., sued the American Physicians Insurance Exchange (APIE) and three other doctors for retaliating against him for testifying on behalf of a plaintiff in a medical malpractice action. The case was submitted to the jury on two theories: tortious interference with business relations and violations of the antitrust laws. The jury found in favor of Dr. Kiepfer on both theories and awarded him over $4 million in damages. The trial judge entered judgment on the verdict as to the doctors, but set the verdict aside as to APIE. Dr. Kiepfer appeals, arguing that there was sufficient evidence to support the jury's verdict against APIE. After a thorough and careful review of the record, this Court concludes that Dr. Kiepfer is at least partly correct. The judgment of the district court must be reversed

in part, and certain aspects of the jury's verdict reinstated.

## I. Facts and Procedural History

The evidence presented at trial tended to show the following facts. In 1979 Dr. Thomas Eades, a cardiologist practicing in San Antonio, Texas, joined the American Physicians Insurance Exchange (APIE). APIE is what is known in Texas law as a reciprocal insurance exchange, meaning that it is an insurance company cooperatively owned by those it insures—some 5,000 doctors in Texas and Arkansas. APIE provides medical malpractice insurance to its member doctors. The exchange is governed by a board of directors elected annually; that board, however, does not attend to the day to day business of providing insurance or investigating, settling, or defending claims. Rather, as provided by Texas statute, see Tex.Ins.Code Ann. art. 19.02 (Vernon 1980), APIE entrusts the day to day operations of its insurance business to an attorney in fact. APIE employs APS Facilities Management, Inc. (APS), to carry out its daily business affairs. The APIE board of directors meets quarterly to review the business and to direct APS to implement any changes in policy the board decides are necessary. Dr. Eades joined APIE in 1979, and was elected chairman of the board of APIE in 1985.

Dr. Eades was a cardiologist in San Antonio, Texas. He and another cardiologist, Dr. Barry Beller, conducted their practice through a professional association which they owned, called Cardiovascular Associates (CVA). In 1979 CVA hired Dr. Kiepfer as a consulting physician. Dr. Kiepfer specialized in nuclear medicine, which allowed him to perform certain tests or scans of heart patients using radioactive isotopes. Dr. Kiepfer conducted his work on CVA's premises but was not an owner of CVA. In addition to his work for CVA, Dr. Kiepfer also accepted referrals from, and performed scans for, other cardiologists. While there was some conflict in the evidence as to whether Dr. Kiepfer performed his work for CVA satisfactorily, he continued to be employed by CVA until the summer of 1985.

In the summer of 1985 Dr. Eades and Dr. Beller learned that Dr. Kiepfer was testifying for the plaintiff in a medical malpractice action being tried in Texas state court. Dr. Eades went to the courthouse and observed some portion of Dr. Kiepfer's testimony. Dr. Eades and Dr. Beller were angered by Dr. Kiepfer's testimony; the reason for their anger, however, is disputed. Drs. Eades and Beller contended that they were angered because Dr. Kiepfer lied on the witness stand. Dr. Kiepfer contended that their anger was due solely to the fact that he was testifying against another member of the medical profession. In any case, almost immediately after his testimony was concluded, Drs. Eades and Beller fired Dr. Kiepfer from his position at CVA. Again there was some conflict in the evidence: Drs. Eades and Beller contended that they fired Dr. Kiepfer for a variety of reasons—among others, that his work had been unsatisfactory and that he had engaged in some unauthorized use of CVA's premises and equipment.

Dr. Kiepfer's evidence tended to show that he was fired primarily because he had testified against another doctor. Dr. Kiepfer further contended, and presented evidence that tended to show, that after he was fired Drs. Eades and Beller engaged in a campaign to persuade other doctors in the San Antonio area to stop referring cases to Dr. Kiepfer. This campaign was very successful. Over a period of sixty days following his firing from CVA, Dr. Kiepfer's referral practice dropped from a high of about $15,000 per month to zero. Finally, in late 1985 APIE notified Dr. Kiepfer that it would not renew his medical malpractice insurance.

In November 1985 Dr. Kiepfer brought this action against APIE, Dr. Eades, Dr. Beller, and Dr. Harold Felter, another cardiologist, alleging that these defendants had combined in restraint of interstate commerce, in violation of the Sherman Act. He also brought various pendent claims under Texas state law, alleging that these defendants had slandered him and that they had tortiously interfered with his contractual relations. The case proceeded to

trial before a jury. The slander claim against APIE was dismissed at the close of the plaintiff's evidence. At the same time, and again at the close of all of the evidence, APIE moved for a directed verdict as to all claims against it, on the grounds that Dr. Kiepfer had failed to show that APIE had engaged in any wrongful conduct, or that any of Dr. Eades' actions were taken on behalf of APIE. The trial judge denied the motion, and submitted the case to the jury.

The jury returned verdicts against Dr. Eades, Dr. Beller, and APIE. By their answers to special interrogatories, the jury found that Dr. Eades, Dr. Beller, and APIE had 1) conspired to restrain interstate commerce in violation of the Sherman Act, and 2) had tortiously interfered with Dr. Kiepfer's ability to obtain referrals, in violation of Texas law. The jury awarded Dr. Kiepfer compensatory and punitive damages. Before judgment was entered on the verdict, Drs. Eades and Beller settled with Dr. Kiepfer, each paying him $950,000 in return for a release from all claims. APIE moved for a judgment notwithstanding the verdict on the same grounds it had urged in its motions for a directed verdict; the trial judge granted the motion. Dr. Kiepfer now appeals from that ruling.

## II. Discussion

### A. *The Standard of Review*

■ The standard of review of a judgment notwithstanding the verdict is well settled. When reviewing a trial judge's decision to grant a judgment notwithstanding the verdict, this Court asks whether the evidence before the jury and any reasonable inferences drawn from the evidence would have allowed a rational jury to reach the conclusion that it actually reached. If not, then it is proper for the trial court to grant judgment notwithstanding the verdict. *Boeing Co. v. Shipman*, 411 F.2d 365, 377 (5th Cir.1969) (en banc). It is for the jury to weigh the evidence before it, judge of the witnesses' credibility, and resolve conflicts. *Id.* Thus, if there is an evidentiary basis for the verdict, the jury's determination will be left undisturbed even

if there is substantial contradicting evidence. *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir.1988). At the same time, however, in considering the evidence the jury is confined only to those inferences which are reasonable; an inference is unreasonable if it allows the jury to rest its verdict on mere speculation and conjecture. *Pregeant v. Pan American World Airways, Inc.*, 762 F.2d 1245, 1249 n. 5 (5th Cir.1985).

The jury found in favor of Dr. Kiepfer on two claims, one alleging that APIE and the other defendants had tortiously interfered with Dr. Kiepfer's business relations, and the other alleging that APIE and the other defendants had conspired to restrain interstate commerce, in violation of the Sherman Act, 15 U.S.C. § 1. The trial judge set aside the jury's verdict on both counts. He ruled that the only potential source of liability for APIE was vicarious liability for the actions of Dr. Eades, the chairman of APIE's board of directors, and that the evidence was insufficient to establish such liability. On appeal, Dr. Kiepfer argues that the evidence was sufficient to allow the jury to hold APIE liable for the actions of Dr. Eades.

### B. *APIE's Liability for Dr. Eades' Actions*

The first question presented is whether Dr. Eades' actions against Dr. Kiepfer—firing him from CVA and conducting a campaign to choke off his referral practice—may be charged against APIE. Those actions might be charged to APIE if, for instance, Dr. Eades were the agent of APIE, or if APIE authorized or ratified Dr. Eades' actions. To determine the extent of APIE's liability for the actions of the chairman of its board of directors, this Court must look to Texas law.

■ The Texas Insurance Code does not contain any provision relating to whether the directors of a reciprocal insurance exchange are agents of the exchange. Accordingly, the question of Dr. Eades' agency must be resolved by resort to the provisions of the Texas Business Corporation

Act.[1] Those provisions and the cases interpreting them make clear that a single director of a corporation, even if he is the chairman of the board of directors, cannot by himself bind that corporation unless he is 1) acting within the course and scope of his duties as director, or 2) his actions are authorized or ratified by the board.

Article 2.02 of the Business Corporation Act sets forth the general powers of a corporation, but provides that

[n]othing in this Article grants any authority to ... directors of a corporation for the exercise of any of the foregoing powers.... Authority of ... directors to act beyond the scope of the purpose or purposes of a corporation is not granted by any provision of this Article.

Texas Bus.Corp.Act art. 2.02(B). Moreover, the Texas cases have long held that only officers and agents of a corporation—not individual directors—have the authority to act for the corporation, and then only as to routine matters arising in the ordinary course of business. *See* Texas Bus.Corp. Act art. 2.42(B) (Vernon 1980). For instance, while the *president* of a corporation has authority to bind her corporation in routine matters arising in the ordinary course of business, *Capital Bank v. American Eyewear, Inc.*, 597 S.W.2d 17, 20 (Tex. Civ.App.—Dallas 1980), *directors* of a corporation "must sit as a board in order to constitute valid corporate action"; the board "may exercise its powers only as a body at a meeting duly assembled and conducted." *Curtis v. Pipelife Corp.*, 370 S.W.2d 764, 767 (Tex.Civ.App.—Eastland 1963). Thus, "[i]ndividual action by a director ordinarily cannot bind the corporation." *American Bank & Trust Co. v. Freeman*, 560 S.W.2d 444, 446 (Tex.Civ. App.—Beaumont 1977). Similarly, the Fifth Circuit has explained that

a director exercises his office only through the collective action of the board of which he is a member and ... has no individual power of action as does an officer who is usually elected or appoint-ed to perform specific duties as agent of the corporation by the board of directors. *FDIC v. Aetna Cas. & Sur. Co.*, 426 F.2d 729, 738 (5th Cir.1970).

▮▮▮ Thus, as a matter of law, APIE is not responsible for Dr. Eades' actions solely because Dr. Eades is the chairman of its board of directors. APIE may be held liable for Dr. Eades' actions only if 1) they pertained to routine matters arising in the ordinary course of his duties to APIE, or 2) they were specifically authorized by APIE or were later ratified by APIE. *Capital Bank*, 597 S.W.2d at 20; *Southern Kansas Ry. Co. of Texas v. Logue*, 139 S.W. 11, 14 (Tex.Civ.App.—San Antonio 1911), *aff'd*, 106 Tex. 445, 167 S.W. 805 (1914). Although it is a close question, this Court concludes that the jury could properly have concluded that APIE was responsible for Dr. Eades' actions under the second of these theories. That is, the evidence was sufficient to support a finding that APIE had authorized or ratified Dr. Eades' actions.

Initially, APIE is correct that there was no evidence which would have allowed the jury to conclude that Dr. Eades' interference with Dr. Kiepfer's consulting practice was in any way part of his regular duties as chairman of the board of APIE. The evidence showed that APIE's bylaws provided that the board of directors of APIE should meet quarterly to review the business, determine the scope and nature of coverages offered by APIE, approve rates, advise APS as to general policy matters, review APS' operating procedures, and so on. APS officials testified that the board rarely reviews individual cases, and that the board does not determine who will or will not be insured. The evidence did not suggest that the board or any of its members had or were authorized to have dealings with individual insureds.

However, there was evidence before the jury that would have allowed it to conclude

---

1. When the Insurance Code fails to address some question of corporate law, it is supplemented by the provisions of the Texas Business Corporation Act to the extent that the Business Corporation Act is consistent with the Insurance Code. *See Texas Bus.Corp.Act* art. 9.14 (West Supp.1991).

that APIE either authorized or ratified Dr. Eades' actions. First, the evidence showed that APIE might well have benefitted from Dr. Eades' actions. Dr. Eades' actions to put Dr. Kiepfer out of business would have a natural tendency to discourage other doctors from testifying on behalf of plaintiffs in medical malpractice actions; as a direct result, it would become considerably more difficult for plaintiffs to win such actions, and APIE's future losses would be reduced. In support of this theory, Dr. Kiepfer adduced considerable evidence tending to show that APIE believed that medical malpractice actions had created a crisis in the health care industry, plainly suggesting that APIE would be receptive to attempts to reduce the number of successful malpractice actions.

It is certainly true, as a matter of Texas law, that the fact that a corporation might gain some indirect or incidental benefit from the acts of one its officers does not, *standing alone*, indicate that the corporation approved or ratified the acts such that it is liable for those acts. *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 743–44 (Tex.Ct. App.—Houston [1st Dist.] 1981). Here, however, the benefit was not indirect or incidental; the potential benefits to APIE would flow directly from Dr. Eades' retaliation against Dr. Kiepfer. More importantly, though, the evidence that APIE would benefit from Dr. Eades' actions did not stand alone. There was additional evidence before the jury indicating that Dr. Eades' actions were taken on behalf of APIE.

There were at least three other pieces of evidence to support the jury's verdict. In his original complaint Dr. Kiepfer alleged in paragraph nine that Dr. Eades was a duly authorized agent of APIE and that his actions were taken within the scope of his duties. In its original answer to the complaint, APIE responded that the allegations of paragraphs one through nine were admitted. APIE later moved to withdraw its answer on the grounds of mistake. The court granted the motion, and APIE filed an amended answer denying the allegations of paragraphs six through nine. At trial, Dr. Kiepfer sought to introduce the original, withdrawn admission into evidence.

The trial judge, relying on *Borel v. United States Cas. Co.*, 233 F.2d 385 (5th Cir. 1956), properly allowed Dr. Kiepfer to introduce into evidence the withdrawn admission. The trial judge correctly instructed the jurors that the withdrawn admission was some evidence of the matter admitted, and that it was up to them to decide what weight to give it. *See id.* at 387–88. APIE contended that the initial admission was no more than a clerical error. The jury, however, which had the opportunity to observe firsthand APIE's witnesses and to assess their credibility, was not required to accept that explanation; instead, pursuant to the trial judge's careful instruction, they were entitled to consider APIE's initial admission of Dr. Eades' authorization as at least some evidence of that authorization.

Second, Dr. Kiepfer introduced evidence suggesting that APIE had previously refused to renew the policy of another doctor because that doctor had testified on behalf of a plaintiff in a medical malpractice action. In 1983 Dr. Salvador Ortiz, a physician insured by APIE, testified on behalf of a plaintiff in a medical malpractice trial. Later that year, APIE notified Dr. Ortiz that it would not renew his professional liability insurance. In a letter sent on APIE stationery and signed by an official of APS, Dr. Ortiz was informed that "[t]he decision to not renew the policy ... relates to a disruptive influence in the medical community, by criticism of your colleagues." Ex. 7. The letter did not elaborate on just what it meant by a "disruptive influence in the medical community," but the jury certainly might have concluded that APIE was referring to Dr. Ortiz' testimony in the medical malpractice trial. Moreover, the jury certainly might have inferred from the evidence before it that APIE, alarmed by what it saw as a "crisis" of medical malpractice insurance, was engaged in an effort to discourage physicians from testifying against other physicians in medical malpractice actions.

The jury could also find support for such an inference in APIE's inconsistencies in explaining its reasons for refusing to renew Dr. Kiepfer's liability insurance.

APIE initially informed Dr. Kiepfer that it was refusing to renew his malpractice insurance because he had received an unfavorable review from a peer review committee. APIE later retracted this explanation; there had in fact been no peer review of Dr. Kiepfer. APIE contended at trial that the reason Dr. Kiepfer's policy was not renewed was that he had sued APIE, and that the error in the initial letter was simply a clerical error. Dr. Kiepfer contended that APIE refused to renew his insurance because he had testified against another doctor. It was up to the jury, of course, to resolve this conflict in the parties' positions; the jury was certainly entitled to believe Dr. Kiepfer and disregard APIE's explanations of the inconsistencies in its story.

In sum, this Court holds that there was sufficient evidence before the jury to allow it to conclude that APIE, alarmed by a "crisis" in medical malpractice insurance, ratified or authorized Dr. Eades' actions against Dr. Kiepfer, and therefore was legally responsible for those actions. Accordingly, the jury's verdict should not have been set aside on grounds that there was insufficient evidence to hold APIE liable for Dr. Eades' torts. The only remaining question is whether, given that APIE is liable for the actions of Dr. Eades, the jury had before it evidence sufficient to sustain its verdicts against APIE on Dr. Kiepfer's antitrust and tortious interference claims.

### C. The Tortious Interference Claim

Dr. Kiepfer alleged and the jury found that the defendants had tortiously interfered with Dr. Kiepfer's ability to obtain referrals of patients from physicians in the San Antonio area. APIE's objections to the jury's verdict on this claim are not well taken.

■ To prevail on a claim of tortious interference with business relations under Texas law, a plaintiff must prove 1) the existence or prospect of a contract, 2) an intentional and willful act interfering with the contract that was calculated to cause damage to the plaintiff, and 3) damages. See Hi–Line Elec. Co. v. Dowco Elec. Prods., 765 F.2d 1359, 1362 (5th Cir.1985) (setting forth elements of action as of 1985); Sterner v. Marathon Oil Co., 767 S.W.2d 686 (Tex.1989) ("Texas law protects existing as well as prospective contracts from interference."). The fact that the defendant's actions may have been legally justified or privileged is an affirmative defense to the action, and the defendant bears the burden of pleading and proving the defense. Sterner, 767 S.W.2d at 689–90.

■ Given that APIE is vicariously liable for the actions of Dr. Eades, it is clear that Dr. Kiepfer provided sufficient evidence of each of these elements. The evidence showed that for several months Dr. Kiepfer had a successful referral practice, a practice which showed no signs of decline. Dr. Kiepfer's prospects for continued referrals were quite good. There is no question that Dr. Eades knew of Dr. Kiepfer's referral business. There also is no question that the evidence before the jury was sufficient to allow it to conclude that Dr. Eades acted with malice: that is, that Dr. Eades interfered with Dr. Kiepfer's referral practice with an intent to injure Dr. Kiepfer. Finally, Dr. Kiepfer sufficiently proved that his damages—the complete loss of his referral practice—was a proximate result of the campaign waged against him by Dr. Eades. In short, this Court is fully convinced that the evidence was fully sufficient to allow the jury to find that Dr. Eades, and therefore APIE, had intentionally and maliciously interfered in Dr. Kiepfer's practice,[2] with the direct result that Dr. Kiepfer suffered actual damages.

---

2. In addition, the Court notes that the jury had before it evidence that APIE had acted on its own to interfere with Dr. Kiepfer's practice, wholly apart from any actions of Dr. Eades. In particular, APIE refused to renew Dr. Kiepfer's medical malpractice insurance. While this refusal, standing alone, is certainly not enough to hold APIE liable for tortious interference with Dr. Kiepfer's referral practice, when viewed in light of APIE's inconsistent explanations for its refusal to renew Dr. Kiepfer's insurance, and APIE's previous refusal to renew the insurance of Dr. Ortiz, it provides significant additional support for the jury's verdict.

**D. *The Antitrust Claim***

The Court is not so convinced about the antitrust claim. Dr. Kiepfer alleged in his complaint that the defendants had violated section 1 of the Sherman Act, in that they conspired to restrain trade by putting him out of business. APIE advances several objections to Dr. Kiepfer's recovery under the Sherman Act; at least one of these has merit.

 APIE points out, and this Court has previously observed, that the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 272 (5th Cir.1979) (holding that, at most, plaintiff had stated a claim for tortious interference but had not stated a claim under the Sherman Act). The limited scope of the antitrust laws results from the fact that they are intended to protect *competition*, not necessarily *competitors*. E.g., *Brown Shoe Co. v. United States*, 370 U.S. 294, 315–16, 82 S.Ct. 1502, 1518–19, 8 L.Ed.2d 510 (1962). An antitrust plaintiff must show not just that the defendants' actions injured him, but that they unreasonably restrained competition. See *Larry R. George Sales Co.*, 587 F.2d at 273–74; *Mosby v. American Medical International, Inc.*, 656 F.Supp. 601, 607 (S.D.Tex.1987). As a result, the federal courts have consistently held that section 1 of the Sherman Act prohibits only unreasonable restraints of trade; in the ordinary case, alleged violations are judged by a "rule of reason." See *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., Inc.*, 714 F.2d 1384, 1391 (5th Cir.1983); *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 790 (5th Cir.1982). Thus, it was incumbent upon Dr. Kiepfer to show that the defendants' conspiracy produced some anti-competitive effect in the relevant market. See *Hornsby Oil*, 714 F.2d at 1394; *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir.1979).

**3.** Dr. Kiepfer also fails to contest APIE's assertion that the defendants' conduct produced no anticompetitive effect. His reply brief is completely silent on the issue. Presumably, if there

Dr. Kiepfer failed to make such a showing.[3] He offered no evidence at all that his departure from the practice of nuclear medicine caused any difficulty for either patients or other doctors in the San Antonio area. The record discloses no evidence at all that the market for consulting services in nuclear medicine was harmed in any way by the loss of one practitioner. The only evidence that even remotely suggested some anticompetitive effect was Dr. Kiepfer's testimony that plaintiffs in medical malpractice actions could not get local doctors to testify for them. Unfortunately for Dr. Kiepfer, this testimony, however accurate, does not show the requisite anticompetitive effect in the market for expert testimony. By Dr. Kiepfer's own admission, this situation existed before the defendants conspired against Dr. Kiepfer, and there was no indication that the defendants' conspiracy made it any more difficult to get local doctors to testify on behalf of medical malpractice plaintiffs.

In the absence of any evidence of anticompetitive effect in any market, the jury could not properly have found that the defendants' actions violated the Sherman Act. The district court properly entered judgment for APIE on the antitrust claim, notwithstanding the jury's verdict in favor of Dr. Kiepfer.

**E. *Dr. Kiepfer's Damages***

Finally, APIE argues that Dr. Kiepfer failed to establish that he personally had suffered any damages, and that he cannot recover any damages for mental anguish. Neither of these arguments has any merit.

 The named plaintiff in this action is Richard F. Kiepfer, M.D., in his individual capacity. APIE makes a two part argument: first, it contends that the only evidence of damage presented to the jury was evidence of damage to a professional association, Richard F. Kiepfer, M.D., P.A., of which Dr. Kiepfer is the sole owner. Second, APIE argues that Texas law treats

were some evidence tending to show an anticompetitive effect, Dr. Kiepfer would have identified it for the Court.

professional associations the same way it treats corporations, and that stockholders and corporations are considered separate entities: one may not recover damages suffered by the other. Thus, the argument concludes, Dr. Kiepfer has proved the wrong damages. He has not proved *his* damages, which he could recover, but only those of his professional association, which he cannot recover.

APIE's argument is not correct. The jury did not award Dr. Kiepfer damages suffered by his professional association. The jury awarded Dr. Kiepfer the damages he personally suffered as a result of the defendants' actions. The fact that evidence of damage to the professional association was introduced to prove damage to his business—which damage must be shown in order to prevail in an antitrust action—and may have been used by the jury to assist in determining what damages had accrued to Dr. Kiepfer personally, does not transform the award into one for damages to the professional association.[4] The award remains one for damages suffered by Dr. Kiepfer as an individual, and there is no basis for setting it aside.

 Finally, APIE argues that Dr. Kiepfer cannot recover any damages for mental anguish because "there was no evidence of mental anguish." Once again, APIE is incorrect. Under Texas law, mental anguish is defined as "the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience" as a result of the defendant's tortious behavior. *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex.1986). As APIE points out, this torment and suffering must include more than mere fear, embarrassment, anxiety, anger, or sorrow; standing alone, none of these conditions warrants an award of damages. *E.g., Larrumbide v. Doctors Health Facilities*, 734 S.W.2d 685, 690 (Tex.App.—Dallas 1987, writ denied).

Dr. Kiepfer's evidence certainly was sufficient to allow the jury to find that he had suffered more than just embarrassment, anxiety, or anger. Dr. Kiepfer testified that as a result of the defendants' intentional torts, he became an outcast in the San Antonio medical community. Other doctors refused to treat his patients and his wife. The complete loss of his referral practice—which occurred shortly after Dr. Kiepfer was married—forced him and his wife to live on his savings while he looked for work. Presented with evidence of this combination of conditions, the jury was unquestionably justified in concluding that Dr. Kiepfer had suffered compensable mental anguish as a result of the defendants' intentionally tortious behavior.

## III. Conclusion

For the reasons stated, the judgment of the district court setting aside the jury's verdict on the antitrust claim is affirmed. The judgment of the district court setting aside the jury's verdict on the claim of tortious interference with business relations is reversed and the jury's verdict on that claim is reinstated. The case is remanded for determination of what credit APIE shall receive, if any, as a result of the payments in settlement made by Dr. Eades and Dr. Beller to Dr. Kiepfer.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**4.** Also, APIE is incorrect as a matter of fact that the evidence of injury to the professional association was the only evidence of injury. As discussed below, Dr. Kiepfer also testified, without contradiction, to the mental anguish he suffered as a result of the defendants' intentionally tortious conduct.