**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-20220

_____

# MENKO STEEL SERVICES, INC.,

Plaintiff-Appellant,

VERSUS

# SCHINDLER ELEVATOR CORP., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-96-CV-2625)

_____

June 15, 1999

Before REAVLEY, POLITZ, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Menko Steel Services, Inc. ("Menko"), appeals a summary judgment rejecting its allegations of: (1) theft and conversion of trade secrets; (2) breach of contract; (3) fraud; and (4) tortious interference with a business relationship. We affirm.

I.

Menko is a Texas-based corporation specializing in the distribution of elevator guide rails[1] to elevator contractors and owners nationwide. It purchases these rails from third-party suppliers, then

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Elevator guide rails line elevator shafts to guide an elevator car moving up and down the shaft. Elevator brakes use guide rails to stop the car.

re-sells them after some modifications requested by the customers.[2]

Defendant Schindler Elevator Corporation ("Schindler") is the second-largest elevator manufacturer in the world. In 1989, it purchased Westinghouse Elevator, Inc.'s, United States elevator operations, including Westinghouse's elevator rail line, giving Schindler the ability to make elevator guide rails in-house. Because Schindler's internal demand for elevator rails was not sufficient to justify continuing to make rails in-house, Schindler determined that it would have to increase its sale of rails to outside elevator manufacturers.

In 1992, Schindler began to market its guide rails to outside manufacturers but met with moderate success. Many of the potential buyers were reluctant to purchase guide rails from Schindler, because it was also their main competitor for elevator manufacturing and installation. To increase its sales, Schindler contacted AFD, a U.S. rail retailer. After negotiations with AFD broke down, Schindler approached Menko to discuss becoming Menko's supplier.

On December 9, 1993, defendant Joseph Knolmajer ("Knolmajer"), manager of Schindler's rail line, telephoned Menko's principals, Bart Menscher and Mike Kotch, to discuss the terms of a supplier arrangement. These discussions continued on February 7, 1994. Unbeknownst to Knolmajer, Menscher recorded both telephone conversations. On February 24, 1994, Knolmajer and defendant Paul Goldsworthy, Knolmajer's boss, flew to Houston for a meeting with Menko.

The parties disagree on the substance of their discussions during these three meetings. Menko contends that they reached an agreement during their December 9 conversation that would make Menko the exclusive distributor for Schindler's guide rails in the United States. Menko also claims that in the December 9 conversation, Knolmajer agreed to keep all information about Menko and its business practices confidential during negotiations. Based on this understanding, Menko says, it then

---

[2] Among other things, Menko spot faces and paints the guide rails while providing the customers with special packaging and bundling to make the guide rails easier to use. Additionally, through its "800-231-RAIL" telephone number, Menko provides last-minute "extras" should its customers come up short on a job site.

disclosed the information about its business practices that are the subject of this lawsuit.[3] Additionally, Menko says that, in reliance on Schindler's supposed pledge to make Menko its exclusive distributor, Menko terminated its other supplier agreements.

Schindler disagrees with Menko's characterization of these meetings and claims that it did not reach an agreement with Menko about the distributorship because the parties were unable to establish an acceptable purchase price for the rails. Schindler also contends that it continued to pursue the prospect of a Menko distributorship until September 1994. Finally, Schindler flatly denies that it acquiesced to any confidentiality agreement with Menko.

During the negotiations, Schindler continued to market its guide rails to other purchasers and announced in a July 1994 letter that it had updated its marketing practices. This "update" included the adoption of an "800" toll-free telephone service to simplify the ordering process. Moreover, Schindler announced that it would market its guide rails under the name "Precision Guide Rail Company" ("Precision") to avoid losing sales to customers reluctant to buy directly from Schindler.

According to Menko, Schindler's July 1994 marketing campaign made it realize that Schindler would not follow through with its distributorship agreement. Menko says that it was also shocked to find out that Schindler had adopted many of Menko's business practices, such as the "800" service, in its new campaign. This campaign was quite successful, and some of Menko's customers, including a large guide rail purchaser named Montgomery, began purchasing from Schindler instead.

## II.

We review a summary judgment *de novo*, employing the same standards as did district court. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 205 (5th Cir.), *cert. denied*, 119 S. Ct. 509 (1998). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24

---

[3] Menko calls this "its most treasured information." This list includes items such as Menko's costs and inventory levels, its contacts, its customer list, its "800" telephone service, and its packaging procedures.

(1986). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

III.

Menko charges that Schindler used the negotiations for a distributorship agreement to acquire confidential information about Menko's business practices, then used the confidential information to compete against Menko in supplying guide rails. To receive trade secret protection under Texas law, Menko must show that (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) the defendant used the trade secret without authorization from the plaintiff. *Phillips v. Frey*, 20 F.3d 623, 617 (5th Cir. 1994) (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991), *aff'd in part*, *reversed in part*, 505 U.S. 763 (1992)). Because Menko failed to allege a genuine dispute

of material fact needed to satisfy the first and third elements of its trade secret claim, we affirm the summary judgment on that claim without reaching the second element.

A.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Associates Int'l v. Altai*, 918 S.W.2d 453, 455 (Tex. 1994) (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958)). "When money and time are invested in the development of a procedure or device that is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist." *T-N-T Motorsports* v. *Hennessey Motorsports*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, writ dism'd) (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 789 (Tex. 1958). Items such as customer lists, pricing information, client information,

customer preferences, buyer contacts, market strategies, blueprints, and drawings have been found to be trade secrets. *Id.*

Before information can be termed a trade secret, there must be a substantial element of secrecy. *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). Although secrecy implies that the information is not generally known or readily ascertainable by independent investigation, *id.*, "[t]he mere fact that knowledge of a product may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means," *T-N-T Motorsports*, 965 S.W.2d at 22. Texas courts give trade secret protection when an effort is made to keep material important to a particular business from competitors. *Id.*

The district court held that the information for which Menko seeks protection does not constitute a "trade secret," because the information "is readily available and easily ascertainable in [the] market." In particular, the court pointed out that Menko has disclosed much of the "stolen" information (i.e., prices it paid suppliers, identity of the suppliers, its customer lists) to other suppliers without requiring secrecy or confidentiality and that other information for which Menko sought protection was also publicly available. For instance, the locations of Menko's warehouses and facilities were published in a brochure (along with its "800" service number), and information regarding packaging and specifications was revealed by the product itself.

Menko challenges the holding on two fronts. First, it argues that a number of factors, ignored by the district court, support its claim for trade secret status. For instance, because much of the information it disclosed to Schindler—including customer lists, customer preferences, and product prices—was developed over a long period of time and required substantial company investment, Menko argues that such information should constitute a trade secret. *See T-N-T Motorsports*, 965 S.W.2d at 22. Additionally, Menko contends that its effort to keep the disclosed information secret by asking Schindler to maintain confidentiality also weighs in favor of trade secret status. *See*

*id.; see also Rugen*, 864 S.W.2d at 552.

We agree with Menko that these factors weigh in favor of considering its information a trade secret. The district court, however, relied on its finding that all the disputed information was either publicly available or had already been voluntarily disclosed. Therefore, Menko must show that it raised a genuine issue of material fact regarding whether its information was "readily available" or "voluntarily disclosed. With one exception, Menko has failed to meet this burden.

We agree with the district court that most of the information for which Menko seeks protection—"800" number, supplier lists, warehouse locations, marketing plans, packing information, and transportation procedures— constitutes readily available public information that should not receive trade secret protection. For instance, the "800" number was widely advertised and made available to Menko's customers with no obligation of secrecy. Additionally, Menko admits that the identity of its suppliers was not secret. Its brochures listed its warehouse locations, and its packing processes are known to all its customers. Finally, Menko did not explain how its use of trains to ship its guide rails was in any way confidential. In sum, the district court did not err in concluding that these widely available pieces of information cannot be considered trade secrets under Texas law.

The district court was also correct in finding that Menko's costs in purchasing guide rails and its sale prices to customers do not constitute a trade secret. The court held that Menko cannot acquire trade secret protection for the cost of buying guide rails from suppliers, because such information is readily available. In particular, Schindler points out that the cost of buying guide rails is simply the price a supplier charges to sell guide rails to Menko. Because Menko has not offered any evidence to show that it tried to keep its suppliers from disclosing these costs, it has no basis for trade secret protection.

Similarly, Menko cannot seek protection for the price for which it sells the guide rails, because this information is readily available to its customers, and Menko has shown no effort to keep this information confidential. Menko calls the combination of its costs and sale price a disclosure of its "gross profit margin." This is beside the point. Because Menko did not disclose its overhead and

6

other indirect costs, Schindler did not know how much net profit (after subtracting indirect costs)

Menko received; therefore, even by underbidding Menko, Schindler could not know whether Menko could match Schindler's lower price.

Menko has raised a genuine dispute of material fact, however, on the question whether its customer lists are readily available. The district court agreed with Schindler that Menko's customer lists are voluntarily shared with its suppliers and customers, but Menko argues that this information has been disclosed only to suppliers who do not operate in the United States. Menko's claim of "limited disclosure" to a single supplier is not enough to constitute a voluntary disclosure of a trade secret. *See Metallurgical*, 790 F.2d at 1200-01 ("Whether a disclosure is limited is an issue the resolution of which depends on weighing many facts.").

According to Menscher's deposition, Menko admitted only to disclosing its customer lists to its suppliers outside the United States.[4] Contrary to Schindler's assertions, Menko never acknowledged that its customer information is freely available in the market. Instead, Menscher explicitly denied Schindler's claim that Menko's customers are publicly known.[5] Even though Menko has raised a genuine dispute of material fact as to whether its customer lists have been voluntarily disclosed, we do not reverse the grant of summary judgment on this issue, because Menko has not met its burden of showing that Schindler used its customer lists against it.

C.

---

[4] "Q.: [H]ave you ever sent lists of your customers to Klockner or Usimeca or Osaka? Have they ever requested that information?

"A.: Requested is not—we were free and open with our supply sources."

[5] "Q.: Well, I—when we talked about your customers yesterday, the bulk of your sales are to a handful of customers. Surely they already know who those customers were.

"A.: They don't know who my customers are, no. There's other supplies—there's other suppliers of elevator guide rail in the United States —."

The district court found no evidence that Schindler actually used the alleged trade secrets to compete with Menko. It found, instead, that Menko's only evidence simply showed that, in the two years following the distributorship discussions, Schindler had sold guide rails to customers who previously had purchased guide rails from Menko. The court held that this evidence, standing alone, was insufficient to show that Schindler had used allegedly confidential information to compete with Menko.

Menko alleges that the record shows four ways in which Schindler used stolen information to compete against Menko: (1) underbidding Menko with Menko's customers; (2) using an "800" number; (3) changing the name of Schindler's guide rail division; and (4) changing its bundling techniques. None of Menko's arguments is persuasive.

First, Menko argues that when selling guide rails to Menko's customers, Schindler used Menko's cost structure to undercut Menko's prices. Menko contends that Schindler calculated the price it quoted to Montgomery, a Menko customer, using the cost structure it obtained from discussions with Menko. It cites evidence in the record showing that Schindler's managers wrote down Menko's prices when trying to calculate what price it should offer to Montgomery.

Schindler has shown, however, that its meeting with Montgomery occurred before its meeting with Menko in Houston and that it offered Montgomery the same price it later offered Menko. Schindler also maintains that it has always offered the low price it offered to both Montgomery and Menko. Menko does not point to any evidence disputing this claim, and its own support from the record is inconclusive.

Schindler also persuasively dispenses with Menko's other claims. It has provided evidence showing it considered giving its guide rail division a trade name long before it began meetings with Menko. It also flatly denies changing its bundling practices and rightly points out there is no support in the record for this charge, either.

Most importantly, Menko also has not explained how Schindler used its customer lists to compete against Menko. Because Menko has raised a genuine issue of material fact on whether its customer

lists were voluntarily disclosed under the first element of a trade secret claim, it could defeat summary judgment if it had explained how its customer lists were used against it. Menko admitted, however, that Schindler was aware of Menko's relationship with Montgomery before Schindler began discussions with Menko.[6] Because Menko did not provide a specific example of how the customer lists were used by Schindler to compete against it, Menko cannot fulfill the third requirement of a trade secret claim based on its customer lists.

Schindler's only troubling defense involves its decision to adopt the "800-RAIL" service number. Schindler claims that because it uses a different exchange prefix, adopting the number cannot be deemed a competitive maneuver. But the similarity between the numbers and the services the number provides indicates that Schindler did use the "800" number to compete against Menko. Because we refused to find the "800" number a trade secret under the first element, however, Schindler's failed defense does not matter, and we still affirm.

IV.

Menko alleges that Schindler committed fraud by opening discussions on a distributorship agreement without ever intending to consummate such an agreement. To prove fraud, Menko must show that (1) a material misrepresentation was made; (2) it was false; (3) the speaker knew it was false when the statement was made or that the speaker made the statement recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the statement with the intention that it be acted upon by the other party; (5) the other party acted in reliance upon it; and (6) the party suffered injury. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). Fraud can be proven by actions as well as by misrepresentations. *Johnson v. Smith*, 697 S.W.2d 625, 632 (Tex. App.—Houston [14th Dist.] 1985, no writ).

Menko still must show, however, that Schindler had the intent to defraud at the time it made its

---

[6] "Q.: Did they [Schindler] have a way of knowing just in the marketplace that you sold rail to Montgomery?

"A.: Yes."

representations and never intended to perform its promise. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). On the other hand, a showing of intent to defraud may be inferred from acts committed by the party subsequent to the fraudulent statement or action. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

The district court rejected Menko's fraud claim and found that Menko had failed to provide proof that Schindler intended to deceive with its words or conduct. Menko attacks that conclusion and argues that Schindler's use of the confidential information against Menko is a "subsequent act" from which the court should have inferred intent to commit fraud.[7]

Menko has failed to show sufficient evidence to raise a genuine issue of material fact as to fraud. None of the Schindler deposition testimony shows sufficient evidence of the requisite intent to deceive, and none of the actions Schindler took support Menko's inferences.

As the district court found, the evidence shows that Schindler approached Menko as part of a larger plan to improve its guide rail business. Schindler began by intending to reach a distributorship agreement with Menko but also made plans to consider other options. An April 8 internal memo produced by Schindler outlined the plan Schindler eventually followed, which involved approaching distributors such as Menko but also considering whether a better deal could be made directly with Montgomery.

Menko failed to provide evidence showing that this memo does not represent Schindler's real intent, and Schindler's subsequent actions carrying out the plan support the district court's conclusion. For this reason, we affirm the rejection of Menko's fraud claim.

V.

Menko charges that Schindler breached its agreement to keep confidential the information disclosed during their negotiations. Even though Menko concedes there was no written

---

[7] Menko raises a second fraud claim in its reply brief when it argues that Schindler fraudulently agreed to keep information confidential. Because Menko did not raise this fraud claim before the district court or in its opening brief, we do not consider it. *See Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 n.1 (7th Cir. 1989).

confidentiality agreement, it argues that Schindler still should be bound its verbal agreement reached during the initial December 9 conversation and again during the February 24 meeting. *See Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 348 (Tex. App.—Fort Worth 1996, no writ). Menko disputes the district court's characterization of this alleged agreement as "vague" and argues that both parties understood what information was covered by the alleged confidentiality agreement. *See Mattalino v. Trinity Petroleum Exploration*, 927 F. Supp. 986, 989 (S.D. Tex. 1996).

Schindler has three responses. First, it argues that Menko waived its right to appeal its breach of contract claim because it did not address Schindler's arguments on the issue in its response to the motion for summary judgment. Though the district court noted that Menko failed to respond to Schindler's arguments on breach of contract in its initial response, Menko did raise these arguments

in its motion asking the court to reconsider the summary judgment. Having done so, and having raised these arguments in its complaint, Menko has preserved the issue for appeal.[8]

Second, Schindler avers that any alleged oral agreement would violate Texas's statute of frauds, because the alleged agreement was not performable within one year. Texas law prevents the enforcement of any agreement not written down and signed, unless such an agreement may be performed within one year.[9] Schindler contends that Menko's characterization of the agreement is so vague and open-ended that there is no foreseeable time when the agreement would end.

We agree with Menko, however, that the agreement could have been characterized as ending when the parties reached a distributorship agreement. Menko persuasively argues that once a distributorship agreement was completed, the alleged confidentiality agreement would no longer be needed, because Menko's and Schindler's interests would be aligned. Therefore, the statute of frauds does not necessarily apply to this issue, and Menko has at least raised a genuine issue of material fact

---

[8] We do not consider, on appeal, materials or evidence not before the district court when it granted summary judgment. *See Muñoz v. International Alliance of Theatrical Stage Employees*, 563 F.2d 205, 209 (5th Cir. 1977). But this rule refers to what evidence a party has submitted rather than to what arguments it has raised.

[9] TEX. BUS. & COM. CODE § 26.01 (West 1994).

as to whether such an agreement would be performable within a year. St ill, as we explain below, because we agree with the district court that there is not enough evidence that any agreement existed, we do not have to consider the applicability of the statute of frauds.

Schindler's third response directly disputes Menko's basic claim that an oral agreement existed governing confidentiality. The district court found that Menko had failed to provide evidence that the parties had agreed on any such agreement's essential terms, including its scope or duration.

"Absent evidence indicating that the material terms of the contract were in fact agreed upon, the contract cannot be enforced." *See T.O. Stanley Boot*, 847 S.W.2d at 221.

Menko has not pointed to any evidence that defeats the district court's finding. As Schindler points out, Menscher admits that he never specified which categories of information should be kept confidential.[10] We agree with the district court that, absent testimony setting forth specific terms of the alleged confidentiality agreement, and absent testimony that such terms were actually agreed upon, Menko has failed to raise a genuine issue of material fact.

## VI.

Menko accuses Schindler of tortiously interfering with Menko's prospective business relationships. Specifically, Menko cites Schindler's courtship of Montgomery, previously a Menko customer.

To prove a claim for tortious interference under Texas law, Menko must show (1) the existence or prospect of a contract; (2) an intentional and willful act interfering with the contract that was calculated to cause Menko damage; and (3) damages. *See Kiepfer v. Beller*, 944 F.2d 1213, 1220

---

[10] In his deposition, Menscher admitted that he did not specify how long the alleged confidentiality agreement would last or what information disclosed in negotiations would be covered by the agreement:

"Q.: Was there a stop time [for the agreement]?

"A.: No, no sir.

"Q.: Well, what were the terms of the agreement?

"A.: I told you. Everything that we were going to discuss was strictly confidential and very sensitive."

(5th Cir. 1991) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690-91 (Tex. 1989).

Texas courts will not, however, require absolute certainty that a prospective contract would have been made but for the defendant's intervention. Instead, Texas courts will look at all the circumstances to determine whether it is reasonably probable that a prospective contract would have been completed. *Verkin v. Melroy,* 699 F.2d 729, 732 (5th Cir. 1983).

Menko must show that Schindler "maliciously interfered" with its reasonable probability of completing a contract with customers such as Montgomery. *See Exxon Corp v. Allsup*, 808 S.W.2d 648, 659 (Tex. App.—Corpus Christi 1991, writ denied). If Schindler can show that its actions are justified or privileged, it has an affirmative defense to a charge of malicious interference. *See Sterner*, 767 S.W.2d at 690.

### A.

Before reaching the merits, we address Schindler's argument that Texas law imposes a two-year limitations period on Menko's tortious interference claims.[11] Menko claims that because the statute starts running from the time the tortious action is committed, Menko's June 1996 lawsuit should be barred because it was filed more than two years after the alleged tortious conduct occurred in March 1994 (the period when Schindler began discussions with Montgomery).

We agree with Menko, however, that the "discovery rule" should apply to this case, because Menko could not have known of the alleged injury when it supposedly occurred in March 1994.[12] Menko alleges that it continued to believe that Schindler sought to complete a distributorship agreement until July 1994, when Schindler began actively marketing its guide rails to Menko customers. Therefore, limitations does not bar the suit filed in June 1996.

---

[11] TEXAS CIV. PRAC. & REM. CODE § 16.003 (West 1994).

[12] The "discovery rule" has been developed for situations in which the plaintiff is unable to know of the injury when it occurs. Thus, "when the discovery rule applies, the period of limitations commences when the plaintiff discovers or reasonably should have discovered its injury." *Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 583 (Tex. App.—Dallas 1991, writ denied).

B.

Menko argues that Schindler tortiously interfered with Menko's relationship with Montgomery by selling two hundred guide rails to Montgomery in 1994. This sale, Menko contends, wrongly interfered with its ability to complete a contract with its longtime customer. Menko avers that Schindler knew that Montgomery was Menko's largest customer and that Menko had a reasonable probability of a future contractual relationship with Montgomery.

The district court rejected the tortious interference claim, finding that Menko had not provided sufficient evidence that Menko had a reasonable probability of completing a contract with Montgomery. Additionally, the court found that Menko had failed to provide evidence to support its allegation that Schindler had acted with malicious intent.

Because Menko's history of selling guide rails to Montgomery suffices to show the reasonable probability that it would complete a contract in the future, we disagree with the district court's finding on that point. We nonetheless affirm this claim, because the court correctly found that Menko had failed to raise a jury question as to whether Schindler maliciously intended to interfere with Menko's potential contract with Montgomery.

As Schindler points out, Menko offered no evidence that Schindler's agents knew its sales to Montgomery would affect Menko's ability to sell guide rails as well. There is no evidence that Schindler specifically sought to target Menko when it approached Montgomery. Menko's best evidence consists of notes made by a Schindler agent comparing Menko's costs and prices with Schindler's. This evidence only shows, however, that Schindler compared its prices to Menko's when making an offer to Montgomery, a reasonable tactic for a business competitor.

Menko's "big picture" allegations rely on inferring malice from Schindler's knowledge of Menko's prior relationship with Montgomery and of the prices Menko offered to Montgomery. We agree with the district court that this evidence, standing alone, does not support Menko's rather serious allegations of malicious intent.

14

As the district court emphasized, Menko's allegations of Schindler's malicious intent cannot survive a summary judgment motion, because Menko's arguments rest "merely on conclusional allegations, improbable inferences, and unsupported speculation." *See International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991); *KRIM v. BancTexas Group*, Inc., 989 F.2d 1435, 1449 (5th Cir. 1993) (holding that unsupported allegations of malice are insufficient to defeat summary judgment).

AFFIRMED.