# IN THE SUPREME COURT OF IOWA

No. 52 / 05-1788

Filed June 16, 2006

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD**,

Appellant,

vs.

**JAMES M. BOX**,

Appellee.

---

On appeal of the report of the Grievance Commission.

Disciplinary board and respondent lawyer each appeal from findings and recommendations of the grievance commission. **ATTORNEY REPRIMANDED**.

Wendell J. Harms, Des Moines, for appellant.

Kent A. Gummert and Frank A. Comito of Gaudineer, Comito & George, L.L.P., West Des Moines, for appellee.

**CARTER, Justice.**

Pursuant to Iowa Court Rule 35.11(2), the Iowa Supreme Court Attorney Disciplinary Board was granted permission to appeal from the findings and recommendations of the Grievance Commission concerning alleged disciplinary rule violations by the respondent attorney. The respondent attorney has cross-appealed from those findings and recommendations. Until now the matter has proceeded under the confidentiality provisions of Iowa Court Rule 35.11(2). Because we now conclude that public discipline is warranted, confidentiality is no longer required, and we refer to the respondent attorney by name in our opinion.

The complaint against attorney James M. Box alleged that he violated Disciplinary Rules 7—104(A)(1) and (2) of the Iowa Code of Professional Responsibility for Lawyers. These rules will henceforth be referred to in our opinion as DRs. DR 7—104(A)(1) prohibits communication by a lawyer representing a client with another person involved in the same transaction if it is known that the other person is represented by counsel with respect to that transaction. DR 7—104(A)(2) prohibits a lawyer representing a client from giving advice to another person whose interests are in conflict with those of the lawyer's client. The Grievance Commission found that attorney Box violated DR 7—104(A)(1), but did not violate DR 7—104(A)(2). Attorney Box on his cross-appeal contends that he violated neither of these disciplinary rules. The appeal of the disciplinary board does not challenge the finding concerning DR 7—104(A)(2), but does challenge the Grievance Commission's recommended sanction of a private admonition for the violation of DR 7—104(A)(1). The disciplinary board urges that the violation that was established calls for public discipline in the form of a reprimand. We agree with that contention.

The facts that bear on our inquiry, as gleaned from the record, show the following events. In September 2001 Martha Hillard was an eighty-year-old widow. She was childless and, although she owned a home in Mediapolis, Iowa, she was then residing temporarily with her niece, Shirley Slonaker, in the Ottumwa area.

Martha had previously owned substantial farm real estate in Des Moines County, but after her brother, John, had moved his farming operations from Des Moines County to the Ottumwa area, she effected a tax-free exchange in 1996 of her Des Moines County farm property for agricultural land of like quantity in a tri-county area in Wapello, Mahaska, and Keokuk Counties. In September 2001 the farm property owned by Martha in this tri-county area totaled 315 acres and had a market value of $975,000.

In June 2001 Martha had executed a will prepared by a Burlington attorney. In that will, she devised a life estate in her farmland to her niece, Shirley Slonaker, with the remainder gifted in equal shares to each of Shirley's four children. One of Shirley's four children was Todd Gingrich. Todd, who was married, was farming Martha's land in the tri-county area under lease in partnership with Martha's brother, John Gingrich.

Sometime prior to August 2, 2001, Martha had been approached by two life insurance brokers who influenced her to convert her estate plan into a living trust and, in the process, purchase some additional life insurance. Ultimately, she never purchased the additional life insurance, but she did execute a living trust instrument prepared by a Cedar Rapids lawyer. The trust was accompanied by a pour-over will that, upon her death, distributed all of her assets to the trust that had not previously been transferred there. The pour-over will revoked the will prepared by the Burlington lawyer less than two months before. Under the trust

instrument, Shirley was to be the sole beneficiary of the trust assets upon Martha's death. Shirley was nominated as executor under the pour-over will and was designated as a successor trustee of the trust.

Martha's brother, John, and her nephew, Todd, learned of her estate planning activities and convinced her to go with them to attorney Box, who had previously represented both John and Todd, in order that Box might explain to her what the ultimate disposition of her property was to be under the trust instrument. They also sought to have Box counsel Martha as to the purchase of additional life insurance. John arranged for a meeting at Box's office in Ottumwa on September 7, 2001. Martha arranged to have the Burlington attorney fax a copy of her June will to Box's office. John and his wife came to the meeting with Todd. Shirley, who had previously furnished Box with a copy of the trust instrument, came to the meeting alone. There was at once an acrimonious discourse between Shirley and the others concerning Martha's affairs.

John and Todd insisted that the discussion not proceed further until Martha was present and drove to Shirley's home to get her. Eventually, Martha joined the others in Box's office. During the course of the discussion that followed, Box, who had read both the June will and the August trust instrument, advised all persons present, including Martha, concerning the contrasting disposition of Martha's assets under the two instruments. He advised all persons concerning Shirley's status as a successor trustee and what her powers would be. He also advised Martha against purchasing additional life insurance.

On September 10, 2001, Martha, accompanied by Shirley, counseled with attorney Orville Bloethe. She arranged to have attorney Bloethe prepare an amendment to the trust instrument, which provided that upon her death Shirley would have a life interest in the trust assets with the

remainder gifted to Shirley's four children in equal shares. This amendment also provided that if one of Shirley's children was farming the agricultural property at the time of Shirley's death that person would have an option to purchase the farm at fair market value. Attorney Bloethe testified before the Grievance Commission that, at the time of the September 10 conference in his office, Martha appeared frightened and told him she was being pressured into granting Todd a five-year lease on the trust farm property and an option to purchase that property for less than market value. Martha had informed Bloethe of the meeting in Box's office three days before. This prompted Bloethe to write attorney Box as follows:

> Martha M. Hillard has visited with me concerning her Last Will & Testament and her Revocable Trust, together with other personal matters.
>
> In the event you would want to communicate with Martha, you should contact me instead inasmuch as I will be representing Martha.

This communication was dated September 11, 2001. Concerning the purposes of that letter, Bloethe testified:

> I didn't want to send those people home without what I would say was protection. I'm just trying to protect them and see that if something came up, then I would be consulted; and then we can sit down and go from there. That's all I was wanting to do.

Several weeks prior to October 10, 2001, Todd and his wife prepared a written five-year lease of the farmland in Martha's trust with John and Todd as tenants. The lease agreement also contained an option for Todd to purchase approximately two-thirds of the trust farm property at a price substantially below its market value. On October 10, 2001, Shirley was visiting one of her children in Virginia. That morning about 8 a.m., John picked up Martha, who was staying at Shirley's house, for purposes of taking her to the Mahaska County Courthouse to claim an agricultural tax exemption for the trust real estate. Todd joined them later in the morning.

While the three were together, Martha was presented with the proposed lease and option-to-purchase agreement, which she signed. According to the testimony of John and Todd, Martha then stated that perhaps she should give the farm property to Todd.

Todd's version of what then occurred was that he declined to accept the property as a gift but expressed a willingness to purchase the land if the price were less than market value. According to both Todd and John, an agreement was then reached for Todd to purchase all of the trust farm property for $362,000 pursuant to an installment contract. The terms of the agreement were to include a down payment of $40,000 by March 1, 2002, and annual payments of $40,000 per year thereafter. John and Todd testified that, after reaching such an oral understanding, they sought to schedule an appointment that same day with an attorney named Neary for purposes of obtaining a written installment contract. That attorney was on vacation. They next contacted attorney Box's law office seeking an appointment with James Box. Box was busy so they obtained an appointment for the afternoon of October 10 with his nephew, who was an associate in the office.

When John, Todd, and Martha went to Box's office later on October 10, Box was in fact available and ushered them into his office. At this time, he was not aware of their purpose in seeking his services. He was told the reason the group was there was Martha's intention to sell the trust farm property to Todd on terms to which the parties had agreed. Box then spoke with Martha concerning Bloethe's letter and expressed the view that he should not be talking to her. According to Box and the others present, Martha responded testily that she could speak to whatever lawyer she

chose.[1]  Box accepted this as a renunciation by Martha of Bloethe's representation of her as to the subject matter of her meeting with Box. After being advised of the agreement that had been reached between Martha and Todd, Box proceeded to prepare an installment contract for the sale of the trust real estate pursuant to the terms that had been previously negotiated.  According to Todd and John, Martha wanted Todd to pay the lowest possible rate of interest.  The only input Box had involving the structure of the transaction was to make a suggestion concerning the minimum rate of interest necessary to avoid an imputed interest penalty under Internal Revenue Service imputed interest rules and to explain how the property taxes should be prorated in order to correspond with the March 1, 2002 possession date. When Box completed the contract document, Todd signed it.  Box then informed Martha that she did not have to sign the agreement at that time or at any other time.  He told her that she could go home and think it over and discuss it with someone else. Notwithstanding that suggestion, Martha signed the agreement in Box's office on October 10.

Later that day, or the following day, Martha spoke with Shirley's ex-husband, Kenneth Slonaker, concerning her visit to the Box law office. Kenneth telephoned Shirley in Virginia concerning that matter, and during the conversation, Martha joined the telephone conversation and told Shirley that she did not know what she had done, but she believed she may have sold the farm to Todd.  On October 18, 2001, an associate in the Bloethe law office wrote to attorney Box, advising him that Martha was rescinding the contract of sale.  This was followed up by two subsequent letters to Box

---

[1]By the time of the Grievance Commission hearing, which took place in September 2005, Martha's memory of the events at the October 10, 2001 meeting in Box's office had faded.  In her testimony before the commission on that subject, she was able to recall few of the details other than to maintain that Bloethe was her attorney at the time.

concerning Martha's intention to rescind the transaction. Eventually, Todd communicated to Martha, through Shirley, that he would not agree to rescission of the contract of sale. Litigation followed in which the district court ultimately rescinded the contract of sale. In the meantime, Martha had amended the trust in such a way that Todd was denied the remainder interest and option to purchase that had previously been accorded him.

Our review is de novo. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb,* 589 N.W.2d 746, 748 (Iowa 1999). The disciplinary board must establish the violations by a convincing preponderance of the evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Adams,* 623 N.W.2d 815, 818 (Iowa 2001). While we give respectful consideration to the Grievance Commission's findings and recommendations, we are not bound by them. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Winkel,* 599 N.W.2d 456, 460 (Iowa 1999). Ultimately, it is our duty to decide what discipline is appropriate. *Id.*

The Grievance Commission found that attorney Box's conduct at the October 10, 2001 meeting constituted a violation of DR 7—104(A)(1). That rule provides:

> (A) During the course of representing a client a lawyer shall not:
>
> (1) Communicate or cause another to communicate on the subject of the representation with a party known to be represented by a lawyer in that matter except with the prior consent of the lawyer representing such other party or as authorized by law.

Iowa Code of Prof'l Responsibility for Lawyers DR 7—104(A)(1).

Attorney Box points out that some courts have found that this rule only applies to formal adversary proceedings such as litigation. *United States v. Ryans,* 903 F.2d 731, 739 (10th Cir. 1990); *Tucker v. Norfolk & W. Ry.,* 849 F. Supp. 1096, 1098 (E.D. Va. 1994). This narrow approach has

been rejected by other courts. The Supreme Court of Vermont addressed the meaning of the word "parties" in DR 7—104(A)(1) as follows:

> [W]e have no trouble concluding that the definition of "parties" under the rule is not restricted to named parties in a lawsuit. The language of the rule suggests no limitation on the word "party." Instead, the rule prohibits communication "on the subject of the representation" with a party that is represented by a lawyer "in that matter." The use of the words "subject" and "matter," rather than "lawsuit," indicates that DR 7—104 applies to all transactions for which lawyers are hired and cannot be construed to imply that its application is limited to cases where suit is filed.

*In re Illuzzi*, 616 A.2d 233, 236 (Vt. 1992). In a similar vein, a New York federal court has concluded:

> [DR 7—104(A)(1)], which has a long history in the canons of ethics, does not by its terms apply only to litigation, nor does it apply specifically to a prosecutor. Indeed, it applies to persons retained to handle real estate transactions, administer estates for an executor, seek legislative relief, or any other of the myriad of tasks for which lawyers are employed. Its essential purpose is to avoid misunderstandings, unfairness or overreaching when a skilled lawyer speaks to a layperson, and to preserve the collegiality which must exist among members of the bar, and cannot if lawyers talk to another's client behind the lawyer's back.

*United States v. Galanis*, 685 F. Supp. 901, 902 (S.D.N.Y. 1988) (citation omitted). We agree with the view of those courts that apply DR 7—104(A)(1) to any transaction in which the contacted party is represented by a lawyer.

Attorney Box next urges that Bloethe's representation of Martha was not in regard to any transaction that was continuing in nature. He points out that Bloethe testified that when Martha left his office on September 10 there was no additional legal work that he was scheduled to do for her (the September 11 letter to Box had been dictated at this time, but not transcribed). This argument ignores the fact that the September 11 letter clearly speaks to contacts with Martha on matters arising in the future. Nor are we persuaded that DR 7—104(A)(1) does not apply because the subject

matter of Bloethe's representation of Martha at the time he wrote the letter did not involve the sale of real estate. The second paragraph of Bloethe's letter is broadly inclusive and indicates that he will be representing Martha in any matter for which Box might need to communicate with her in Box's professional capacity. We are satisfied that this was also Martha's view of their relationship.

The final argument advanced by Box in contending that he did not violate the disciplinary rule is that Martha waived representation by counsel by presenting herself at his office and responding to his reference to Bloethe's letter by stating that she could talk to whatever lawyer she chose. To accept this contention would in our view greatly undermine the protection sought to be afforded by DR 7—104(A)(1). As observed by the Tennessee Supreme Court:

> The main function of the disciplinary rule [7—104(A)(1)] is to preserve the proper functioning of the legal system and to "prevent situations in which a represented party may be taken advantage of by adverse counsel."

*Monceret v. Bd. of Prof'l Responsibility*, 29 S.W.3d 455, 459 (Tenn. 2000) (quoting *Wright v. Group Health Hosp.*, 691 P.2d 564, 567 (1984)) (footnote omitted). The court in *Monceret* went on to state:

> [T]he language of the Rule specifically requires the consent of the party's *lawyer*, and there is no indication that the party alone may waive the protections of the Rule. . . .
>
> . . . .
>
> An apparent majority of courts have followed this interpretation and have held that the Rule is not waived simply because the represented person initiates contact or is otherwise willing to communicate. . . . In short, the ethical responsibility rests with the attorney and not the layman.

*Monceret*, 29 S.W.3d at 461 (citations and footnote omitted). In a similar vein, the Indiana Supreme Court has stated that "lawyers should independently verify that opposing parties wishing to communicate directly

with them are in fact not represented by counsel . . . ." *In re Capper*, 757 N.E.2d 138, 140 (Ind. 2001). We are in accord with the interpretation of the rule that the Tennessee and Indiana courts have approved.

The Minnesota Supreme Court recently traced the lengthy history of the so-called "no contact rule" as an accepted principle of legal ethics beginning in 1836. *State v. Miller*, 600 N.W.2d 457, 463 n.5 (Minn. 1999). This discussion indicates the rule has been universally accepted during the Twentieth Century and was included first in the American Bar Association's 1908 Canon of Ethics and has been carried forward in both the ABA Code of Professional Responsibility for Lawyers (which is the basis for DR 7—104(A)(1)) and is now included in rule 4.2 of the ABA Rules of Professional Conduct. We adopted rule 4.2 of the ABA Model Rules effective July 1, 2005. Our version of that rule, Iowa R. Prof'l Conduct 32:4.2, provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Comment 3 accompanying that rule provides:

> The rule applies even though the represented person initiates or consents to the communication. A lawyer must immediately terminate communication with a person if, after commencing communication, the lawyer learns that the person is one with whom communication is not permitted by this rule.

We are satisfied that neither this new ethical rule nor the comment accompanying it added any new ethical requirement that had not been contained in DR 7—104(A)(1). The substance of comment 3 is embodied in the language of DR 7—104(A)(1) that specifically requires the consent of the party's lawyer. Based on our conclusion as to the meaning of DR 7—104(A)(1), we find by a convincing preponderance of the evidence that Box

violated that rule by carrying out the October 10, 2001 transaction with Martha.

We are not suggesting that DR 7—104(A)(1) serves to defeat the right of the party sought to be contacted by an attorney to discharge that party's own lawyer. It does, however, require verification that this has been done before the other lawyer makes contact with a previously represented party. We are satisfied that DR 7—104(A)(1) required Box to recognize the vulnerability of Martha, as an unrepresented party at the meeting, and, at the very least, to verify the status of Bloethe's representation by a simple telephone call.

In considering the application of DR 7—104(A)(1) as a rule of legal ethics, we are not concerned with the bona fides of the real estate sales transaction between Martha and Todd. Even if the facts presented convinced us that Martha, in the exercise of sound and independent judgment, wished to sell the land to Todd for the contract price, this would not alter the fact that attorney Box violated the disciplinary rule by failing to run the proposed transaction through her attorney. The circumstances facing Box at the October 10 meeting were such that he should have welcomed the participation of an attorney representing Martha's interests. The acrimonious discourse among family members concerning Martha's affairs that took place in Box's office on September 11 should have served as a warning to him that controversy was likely to arise from the sale of property to his client, who was one of several objects of Martha's bounty, for only one-third of its value.

Having determined that Box has violated a disciplinary rule, we agree with the disciplinary board's conclusion that this conduct warrants a public reprimand rather than the private admonition recommended by the Grievance Commission. The proper sanction to be imposed for a

disciplinary violation rests on the particular facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Herrera,* 626 N.W.2d 107, 115 (Iowa 2001). Comparison with other disciplinary cases involving like conduct is a factor that ordinarily weighs heavily in our determination of a proper sanction. In the present situation, a case exactly like this one is not available because our previous decisions dealing with a violation of DR 7—104(A)(1), *Herrera,* 626 N.W.2d at 113-14, and *Comm. on Prof'l Ethics & Conduct v. Zimmermann,* 522 N.W.2d 619 (Iowa 1994), involved additional violations by the offending attorneys. We concluded that the two violations in combination warranted a public reprimand in *Zimmermann* and a suspension in *Herrera.* Despite the absence of a similar case, we can draw some comparison from cases involving simple conflicts of interest in which a public reprimand or suspension has been ordered. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner,* 599 N.W.2d 721, 730 (Iowa 1999) (suspension ordered); *Comm. on Prof'l Ethics & Conduct v. Jackson,* 492 N.W.2d 430, 434-35 (Iowa 1992) (reprimand ordered). Of more importance perhaps is the fact that Box's violation resulted in substantial harm, initially to Martha, and eventually to his own client. We have consistently held that harm to a client or third party is an aggravating factor with regard to disciplinary violations. *Adams,* 623 N.W.2d at 819; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Jay,* 606 N.W.2d 1, 4 (Iowa 2000); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Freeman,* 603 N.W.2d 600, 604 (Iowa 1999).

In making our decision, we do not ignore the fact that Box has established a fine reputation as a competent attorney who has served his clients well for many years. His ethical lapse in October 2001 was an isolated incident that was inconsistent with his normal pattern of care and concern for the profession. Notwithstanding that factor, the ethical

violation we have discussed did occur, and Box must bear the consequences of that violation. We hereby reprimand attorney James M. Box and order that he pay the costs of this disciplinary proceeding.

**ATTORNEY REPRIMANDED.**