# IN THE SUPREME COURT OF IOWA

No. 12–1025

Filed October 19, 2012

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**DEAN A. STOWERS,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent has committed ethical infractions and recommends he receive a public reprimand. **LICENSE SUSPENDED**.

Charles L. Harrington and David J. Grace, Des Moines, and Margaret E. Johnson, Sidney, for complainant.

Brent B. Green of Duncan, Green, Brown & Langeness, P.C., Des Moines, for respondent.

**WATERMAN, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board brought a complaint against Dean A. Stowers, alleging he violated four rules of professional conduct by sending threatening emails to several individuals after the multimillion dollar settlement of a lawsuit that his wife, Jan Reis, filed against her former employer, Care Initiatives. In *Reis v. Iowa District Court*, 787 N.W.2d 61, 69–70 (Iowa 2010), we affirmed the district court's ruling that Stowers's emails constituted contempt of a protective order in that action. A division of the Grievance Commission of the Supreme Court of Iowa applied the doctrine of issue preclusion to determine Stowers violated two of the four disciplinary violations charged by the Board. The commission recommended we publicly reprimand Stowers. On our de novo review, we find Stowers violated all four rules and suspend his license to practice law for ninety days.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 528 (Iowa 2011). We give the commission's findings respectful consideration, but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schmidt*, 796 N.W.2d 33, 36 (Iowa 2011). "The [B]oard must establish attorney misconduct by a convincing preponderance of the evidence." *Dunahoo*, 799 N.W.2d at 528. When the Board establishes attorney misconduct, we can impose a more or less severe sanction than that recommended by the commission. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wagner*, 768 N.W.2d 279, 282 (Iowa 2009).

## II. Prior Proceedings and Factual Background.

The commission conducted a two-day evidentiary hearing on January 24 and 25, 2012. The facts are consistent with the facts detailed in our *Reis* opinion. *See Reis*, 787 N.W.2d at 64–65.

Stowers's now former wife, Reis, had worked for Care Initiatives, a nonprofit entity in West Des Moines, for just over ten years. She attained the position of Chief Operating Officer (COO) and became a member of its board of directors. On August 24, 2005, she made a formal internal complaint alleging sexual harassment by the president of Care Initiatives, H.W. She also filed a complaint on September 26 with the Iowa Civil Rights Commission (ICRC). Care Initiatives placed her on administrative leave on October 5. On November 15, Reis sued H.W., a Texas resident, in federal court for assault and battery. The next day, Care Initiatives terminated her employment and removed her from its board. Reis filed additional charges with the ICRC in late 2005 and early 2006 alleging sexual harassment, retaliation, and wrongful termination. She received an administrative release from ICRC and filed an action against Care Initiatives and H.W. in the Iowa District Court for Polk County on April 26, 2006. Her petition alleged she was terminated in retaliation for standing up to sexual harassment and attempting to blow the whistle on Care Initiatives' failure to comply with tax requirements for nonprofit executive compensation. She was represented in her lawsuit by attorneys Paige Fiedler and Thomas Newkirk.

During this litigation, counsel for Reis and Care Initiatives agreed to a protective order entered by the court. Reis and Stowers each signed an "Undertaking To Be Bound By Protective Order," which allowed them access to documents Care Initiatives deemed confidential. The protective order provided that all documents designated as confidential shall be

used "only for the purposes of this litigation and for no other purpose, except as otherwise provided in this Stipulation and Protective Order." The protective order further stated:

> All persons who are afforded access to any documents or information subject to this Stipulation and Protective Order *shall not use or disclose* such documents or information for purposes of business or competition, or *for any purpose other than the preparation for and the conducting of this proceeding,* or any appellate review thereof, and then solely as contemplated herein, and shall keep the documents and information secure and confidential in accordance with the purposes and intent of this Stipulation and Protective Order.

(Emphasis added.)

Care Initiatives settled with Reis in November 2007. Care Initiatives paid $4 million to Reis, which included her attorney fees. The settlement agreement required Reis to return to Care Initiatives "any and all documents in her . . . possession including copies in any form, that pertain to Care, Reis's employment at Care, or Reis's lawsuit against Care" except payroll records, her personnel file, and her medical and mental health records.

After the settlement, Stowers, acting on behalf of Reis, instructed Newkirk and Fiedler to deliver their case file and all documents to Reis, including the confidential documents subject to the protective order and settlement agreement. They complied. In January 2008, Newkirk wrote counsel for Care Initiatives, stating:

> [O]ur firm no longer represents Ms. Reis or Mr. Stowers. Ms. Reis has taken possession of all documents related to her case and she therefore has possession of any hard copies to be returned pursuant to the agreement and any digital files or documents on an external hard drive. Any future communication regarding document exchange or agreed destruction of digital files needs to be directed to her or to Dean Stowers.

Stowers, with the confidential documents now in his wife's possession, sent the emails at issue. He was prompted to do so by a news media account of an investigation by Senator Charles Grassley into excessive executive and director compensation at Care Initiatives. Stowers first sent an email on February 12, 2008, to M.M., Senior Vice President and Chief Financial Officer (CFO) of Care Initiatives, with the subject line "Your Resignation." The email, sent at 6:51 p.m., stated:

> It looks as though your time has arrived.
>
> Based upon information known and that disclosed publicly, including apparent violations of Titles 18 and 26 of the United States Code, you are being afforded the opportunity to quietly tender your resignation from all positions held with Care Initiatives and relinquish all rights you may claim under any agreements that you have with Care Initiatives by the close of business on February 13, 2008 by 4:00 p.m. cst.
>
> If you avail yourself of this opportunity, you should promptly vacate the premises and not return to them or access any electronically-stored information and you should further surrender all keys, documents, records and other property of Care Initiatives in your possession by 4:00 p.m. cst tomorrow.
>
> You may tender your resignation and waiver of rights to the Board of Directors in writing and kindly provide a copy to me if you wish to take advantage of this limited opportunity.

The next day, Stowers sent an email to R.T., a lawyer and member of the board of directors of Care Initiatives, with the subject line "Your Time Is Up." The email stated:

> Your options have narrowed substantially in the past two months. You need to focus on just two things in my estimation: 1) not getting yourself disbarred and indicted for fraud, and 2) preserving what may be left of your assets and already low reputation in the legal and lobbying community.
>
> You should have taken my advice a long time ago. Nobody wants to completely humiliate and embarrass you, but you have a way of placing yourself in positions where that can not be avoided . . . . Suffice it to say you are not competent for the position at Care Initiatives, nor do you

possess the requisite character and judgment required for such a position. Your dilemma is grave indeed, even though you may not fully realize it even to this day.

I want to give you the chance to resolve your dilemma without as much trauma to you as would occur if you do not accept the proposal I am about to make. So, here it is --

1. You will make a personal cash donation to a charitable cause in the name of Jan Reis selected by Jan Reis and myself in an amount equal to all payments that you have received from Care Initiatives from August 2005 to the present; and

2. You will immediately resign from the Board of Care Initiatives and sever all ties to Care Initiatives. You are, of course, free to date anyone you wish since this is a free country, and you have my permission to do so.

Don't doubt my resolve, ability to carry through, or intent to seek complete vindication, [first name]. You have a very narrow window of opportunity that you and any legal counsel representing you personally should jump on without delay before it closes. Don't make this painful for yourself.

R.T. had received payments from Care Initiatives exceeding $100,000 since August 2005, the amount Stowers now effectively demanded R.T. pay in Reis's name to a charity to be selected by Reis and Stowers.

The following day, Care Initiatives' counsel, Randy Armentrout, sent a letter to Stowers referencing the protective order and settlement agreement. Armentrout directed Stowers to return Care Initiatives' documents. Stowers replied by an email on February 17 that disputed his obligations under the protective order and noted he was not a party to the settlement agreement signed by his wife. Stowers's email continued by noting "Care Initiatives is under one or more federal investigations" and that an ethics complaint was pending against R.T. and suggested the documents at issue related to those matters. Stowers added, "Care Initiatives and it's [sic] various counsel have shown a practice of secreting and/or destroying evidence of wrongdoing." The next paragraph began, "From what I have seen there appears to be sufficient basis for criminal prosecutions of [M.M.,] . . . [R.T.,] [and

others]." Stowers's email indicated he felt a need to retain the documents to preserve evidence for federal investigations and until "Care Initiatives had cleaned house."

Armentrout and Stowers exchanged several more unproductive communications. "Care Initiatives [then] filed an application for contempt and to enforce the settlement agreement, asking the court to order Reis [and] Stowers . . . to show cause why they should not be held in contempt." *Reis*, 787 N.W.2d at 65. The district court, following an evidentiary hearing, concluded Stowers's emails violated the protective order and found both Reis and Stowers in contempt of court. *Id.* They appealed. The court of appeals reversed. *Id.* On further review, this court vacated the court of appeals decision and affirmed the district court's contempt order as to Stowers but reversed the contempt order as to Reis. *Id.* at 75. We expressly rejected Stowers's argument that "threatening public humiliation, demanding resignations, and extracting money payments to a charity in his wife's name cannot support a finding beyond a reasonable doubt that he 'used' the documents produced under the protective order." *Id.* at 69. We concluded that, by sending the threatening emails predicated on knowledge gained from the confidential documents, "Stowers was 'using' the documents to gain a tactical advantage over Care Initiatives" and did so "in an attempt to exert influence and pressure on a Care Initiatives' CFO, board member, and attorney." *Id.* at 71.

This disciplinary proceeding followed.

### III. Ethical Violations.

**A. Violation of Protective Order.** The Board alleged Stowers's emails violated the district court's protective order and constituted a violation of rule 32:3.4(c). That rule states "[a] lawyer shall not . . .

knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." Iowa R. Prof'l Conduct 32:3.4(c).

In *Reis*, we affirmed the district court's contempt order based on evidence Stowers "used" the confidential documents by sending the threatening emails in violation of the protective order. 787 N.W.2d at 70–71. Contempt is

> " 'conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, . . . coupled with an unconcern whether the contemner had the right or not.' "

*Id.* at 68 (quoting *Amro v. Iowa Dist. Ct.*, 429 N.W.2d 135, 140 (Iowa 1988)). We reasoned:

> When the emails to the CFO and board member are considered in combination with the letter from Fiedler & Newkirk, informing Care Initiatives that Reis or Stowers were to be contacted about the documents, and Stowers's email to Armentrout, which essentially refuses to return the documents, it is clear Stowers was "using" the documents to gain a tactical advantage over Care Initiatives. Stowers['s] emails "used" the documents in an attempt to exert influence and pressure on a Care Initiatives' CFO, board member, and attorney. The district court's determination holding Stowers in contempt of the protective order is affirmed.

*Id.* at 71.

The Board contends this conclusion has preclusive effect and establishes Stowers violated rule 32:3.4(c). Stowers argues the Board's offensive use[1] of issue preclusion is not appropriate in this case, and alternatively, he did not violate the rule because he acted in good faith. The commission gave preclusive effect to our 2010 ruling and, in the

---

[1]*See Hunter v. City of Des Moines*, 300 N.W.2d 121, 123–24 (Iowa 1981) (discussing differences between defensive and offensive use of issue preclusion).

alternative, concluded the convincing preponderance of evidence established Stowers violated the protective order.

Iowa Court Rule 35.7(3) expressly permits the Board to invoke issue preclusion in attorney disciplinary proceedings. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. D.J.I.*, 545 N.W.2d 866, 871 (Iowa 1996) (observing under the former version of rule 35.7(3), rule 118.7, that issue preclusion "may be used by either party in a lawyer discipline case"). Under that rule, the Board must establish:

> *a.* The issue has been resolved in a civil proceeding that resulted in a final judgment, or in a criminal proceeding that resulted in a finding of guilt, even if the Iowa Supreme Court Attorney Disciplinary Board was not a party to the prior proceeding.
>
> *b.* The burden of proof in the prior proceeding was greater than a mere preponderance of the evidence.
>
> *c.* The party seeking preclusive effect has given written notice to the opposing party, not less than ten days prior to the hearing, of the party's intention to invoke issue preclusion.

Iowa Ct. R. 35.7(3).[2] We have held offensive issue preclusion does not violate due process. *D.J.I.*, 545 N.W.2d at 874, 877 (holding our court rule, then rule 118.7, applies retroactively); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Polsley*, 796 N.W.2d 881, 884–85 (Iowa 2011) (applying offensive issue preclusion); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 809 (Iowa 2006) (same).

The three requirements of rule 35.7(3) are satisfied here. First, Stowers's contemptuous violation of the protective order was an issue "resolved in a civil proceeding that resulted in a final judgment" for purposes of rule 35.7(3)(*a*). We equate our prior decision affirming his

---

[2]All citations to the Iowa Court Rules are to the 2012 version, effective February 20, 2012.

contempt to "a final judgment" under rule 35.7(3)(*a*). Stowers contends the contempt ruling in *Reis* was not final because on remand the district court did not enter a contempt judgment, but a discovery sanction. Stowers places undue emphasis on the specific entry of judgment on remand. "Finality is a term of art for res judicata." *Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 25 (Iowa 2012). "Finality for purposes of res judicata requires [only] that a firm and considered decision has been made by the court . . . ." *Id.* at 25, 26 (holding judicial acceptance of an *Alford* plea of guilty to theft charge is final for issue preclusion purposes in a subsequent civil collection action, even though the criminal record of theft was expunged upon successful completion of the terms of a deferred judgment).

The ultimate final judgment need not be on the specific issue to be given preclusive effect. *Id.* ("[I]t is the court's factual-basis determination when accepting the plea that provides the plea's preclusive effect, not the subsequent sentence and deferred judgment."). We affirmed the district court's determination that Stowers's emails were in contempt of the protective order. *Reis*, 787 N.W.2d at 71 ("The district court's determination holding Stowers in contempt of the protective order is affirmed."). The resolution of that issue is sufficiently "firm and considered" to be final for issue preclusion purposes. The issue was "resolved" in the contempt proceedings for purposes of rule 35.7(3)(*a*).

Second, the burden of proof in Stowers's prior contempt proceeding was greater than a preponderance of evidence for purposes of rule 35.7(3)(*b*). *Cf. Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Remer*, 617 N.W.2d 269, 272 (Iowa 2000) (declining to apply issue preclusion because the burden of proof in the prior proceeding was not greater than a mere preponderance of the evidence). Contempt

proceedings are quasi-criminal actions that must be established by proof beyond a reasonable doubt. *Ary v. Iowa Dist. Ct.*, 735 N.W.2d 621, 624 (Iowa 2007).

Third, the notice to Stowers required by rule 35.7(3)(*c*) was timely provided. The Board stated in its complaint against Stowers that it "intend[ed] to invoke issue preclusion in proving the allegations of this complaint." *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 812 N.W.2d 4, 9 (Iowa 2012) (deeming use of issue preclusion improper because the Board had failed to provide notice it intended to invoke the doctrine).

Although the requirements stated in rule 35.7(3) are satisfied, Stowers nevertheless argues offensive issue preclusion is inappropriate. Our precedent recognizes two additional considerations when issue preclusion is invoked offensively: (1) whether the opposing party in the prior action had a full and fair opportunity to litigate the issue and (2) whether any other circumstances justify permitting the party to relitigate the issue. *Van Haaften*, 815 N.W.2d at 22. This precedent developed through our common law, distinct from cases interpreting and applying court rule 35.7(3). Assuming without deciding these requirements apply under rule 35.7(3), we conclude issue preclusion should be applied.

Stowers primarily relies on alleged defects in the prior contempt proceeding. Stowers contends the finding we affirmed on appeal, that his emails were in contempt of the protective order, was not the basis for the contempt originally pled by Care Initiatives. He also argues the district court erred in finding contempt because it was unclear whether the protective order continued after settlement and because the district court made evidentiary errors. These arguments were considered and rejected in our prior decision. *Reis*, 787 N.W.2d at 66–70. We held Stowers

knowingly and willfully violated the protective order beyond a reasonable doubt. *Id.* at 70. Stowers had a full and fair opportunity to litigate his contempt in those proceedings, all the way through appeal to our court. We find no special circumstances allowing Stowers to avoid issue preclusion here.

Based on issue preclusion, we find Stowers, in contemptuously violating the protective order, "knowingly disobey[ed] an obligation under the rules of a tribunal." Iowa R. Prof'l Conduct 32:3.4(c). Stowers next argues that, even if the prior contempt finding is given preclusive effect, he did not violate rule 32:3.4(c) because he made an "open refusal" to obey the protective order based upon his good-faith belief he did not have to comply. We stated in our prior decision:

> Stowers suggests his emails cannot violate the protective order because he was simply alerting Care Initiatives that he might be required to report illegal behavior discovered during the course of the lawsuit. The right or duty of a litigant or lawyer to report illegal behavior to the proper authorities if it is discovered during the course of a civil proceeding is not before this court. Stowers was bound by the protective order which prevented use or disclosure of the documents. The protective order allowed modification, and if Stowers was concerned about his ethical or legal duties, he could have moved to modify the protective order to allow disclosure of documents to the proper authorities.

*Reis*, 787 N.W.2d at 70.[3] We decline to allow Stowers to relitigate whether his emails contemptuously violated the protective order, and we reject his "open refusal" defense to rule 32:3.4(c). The commission found that Stowers, by sending the threatening private emails, did not act openly in court but rather "proceeded vigilante-style to use threats of

---

[3]We provide guidance for the modification of protective orders in *Comes v. Microsoft Corp.*, 775 N.W.2d 302, 309–10 (Iowa 2009).

embarrassment, disbarment, and prosecution to extra-judicially seek remedies." We agree with the commission's finding.

For these reasons, we find Stowers violated rule 32:3.4(c).

**B. Communication with Persons Represented by Counsel.** The Board charged Stowers with violating rule 32:4.2(a), which states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Iowa R. Prof'l Conduct 32:4.2(a). When the client is an organization, the rule prohibits communication with certain constituents of the organization. Iowa R. Prof'l Conduct 32:4.2 cmt. 7; *see, e.g., Terra Int'l, Inc. v. Miss. Chem. Corp.,* 913 F. Supp. 1306, 1321 (N.D. Iowa 1996) ("The court concludes that ex parte contacts should not be permitted with managerial level employees . . . ."). The first comment to this rule identifies the primary purposes underlying the rule:

> This rule contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship, and the uncounseled disclosure of information relating to the representation.

Iowa R. Prof'l Conduct 32:4.2 cmt. 1; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Olson,* 807 N.W.2d 268, 277 (Iowa 2011) ("This rule is designed to 'protect[] the represented party from the imbalance of legal skill and acumen between the lawyer and that party.' " (quoting *Schmidt,* 796 N.W.2d at 40)).

The Board argues M.M. and R.T. were "constituents" of Care Initiatives, which Stowers knew was represented by counsel. Stowers

denies M.M. and R.T. were "constituents" of Care Initiatives, and Stowers claims the Board failed to establish his emails were done while "representing a client" or related to any ongoing "matter" because his wife's lawsuit had been concluded.

The commission found Stowers did not violate this rule. It rejected the Board's contention that the "matter" at issue was the return of the confidential documents and that Stowers had an attorney–client relationship with his wife in that matter. The commission also found the Board failed to establish M.M. and R.T. were constituents of Care Initiatives because "[t]he evidence at [the] hearing was that Armentrout only represented Care Initiatives and H.W., as its CEO, and that any other constituents of Care Initiatives would require separate counsel." We disagree with the commission's findings as to M.M.

First, we find Stowers was representing his wife and himself through the email communications. In *Reis*, we concluded there was "sufficient evidence supporting the district court's finding that Stowers acted as an attorney to Reis during the litigation." 787 N.W.2d at 73. Similarly, we find a convincing preponderance of the evidence establishes Stowers's emails to M.M. and R.T. were made pursuant to his attorney–client relationship with Reis. *State v. Parker*, 747 N.W.2d 196, 203 (Iowa 2008) (stating an attorney–client relationship exists if (1) a person sought advice from an attorney, (2) pertaining to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agreed to give assistance). After the settlement, Reis, through Stowers, terminated or restricted Fiedler and Newkirk's representation, and Stowers requested they send the confidential documents at issue to his wife. Reis testified in her deposition that she relied on Stowers at times for legal advice during her lawsuit against Care Initiatives.

Second, Reis and Stowers had an ongoing dispute with Care Initiatives over the return of the confidential documents pursuant to the settlement agreement and protective order that remained in effect. This was not an innocuous communication with a represented client over housekeeping matters to implement an amicable settlement. Rather, this was a contentious adversarial dispute over confidential documents subject to a continuing protective order that escalated into contempt proceedings. Stowers's threatening emails were directly related to the confidential documents at issue. *Reis*, 787 N.W.2d at 70–71.

Third, we conclude M.M. is a constituent of Care Initiatives within the meaning of rule 32:4.2(a). Although the rules do not contain a formal definition of "constituent," the rule of professional conduct that governs attorneys' conduct when representing an organizational client identifies the organization's directors, officers, employees, members, and shareholders as constituents of the organization. *See* Iowa R. Prof'l Conduct 32:1.13(f) ("In dealing with an organization's directors, officers, employees, members, shareholders, *or other constituents*, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing." (Emphasis added.)); *see also Tiano v. Palmer*, 621 N.W.2d 420, 423 (Iowa 2001) ("When the same word or term is used in different statutory sections that are similar in purpose, they will be given a consistent meaning."). Under this definition, M.M., an officer, and R.T., a member of the board of directors, were both constituents of Care Initiatives.

However, rule 32:4.2(a) does not prohibit ex parte communication with *all* constituents of the represented organization, but rather limits it to the constituents "who supervise[], direct[], or regularly consult[] with

the organization's lawyer concerning the matter or ha[ve] authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for the purposes of civil or criminal liability." Iowa R. Prof'l Conduct 32:4.2 cmt. 7. The first category of constituents covered by rule 32:4.2(a) are those who "regularly consult[]" with the organization's lawyer concerning the matter. Iowa R. Prof'l Conduct 32:4.2, cmt. 7; *see also Terra*, 913 F. Supp. at 1321. One purpose of applying this rule to these particular constituents is to prevent "the uncounseled disclosure of information relating to the representation." Iowa R. Prof'l Conduct 32:4.2 cmt. 1.

In determining which categories of current corporate employees are covered by this rule, the court in *Terra* concluded that counsel should not be permitted to communicate ex parte with any "managerial level employees." *Terra,* 913 F. Supp. at 1321. The *Terra* court held that Iowa's former rule DR 7–104(A)(1) (now rule 32:4.2), did not permit opposing counsel to engage in ex parte contacts with the corporation's shipping supervisor who oversaw no more than seven employees at a time. *Id.* A senior vice president and CFO of an organization, such as M.M., qualifies as a "managerial level employee[]." This conclusion is buttressed by the fact that shortly after Stowers's email to M.M., Care Initiatives' attorney, Armentrout, contacted Stowers to enforce the protective order and settlement agreement. We find the evidence establishes M.M. is a constituent of Care Initiatives whom Stowers could not contact without the consent of Armentrout.

The second category of constituents covered by rule 32:4.2 are those "who . . . ha[ve] authority to obligate the organization with respect to the matter." Iowa R. Prof'l Conduct 32:4.2 cmt. 7. Care Initiatives is a

Texas nonprofit corporation. Under the laws of that state, the " '[b]oard of directors' means the group of persons vested with the management of the affairs of the corporation, regardless of the name used to designate the group." Tex. Bus. Orgs. Code Ann. § 22.001(1) (West, Westlaw current through 2011 Reg. Sess. & 1st Called Sess. 82d Legis. Sess.). While the board of directors as a whole possesses the power to manage the corporation, a single director ordinarily does not have the authority or power to bind the corporation. *See Kiepfer v. Beller*, 944 F.2d 1213, 1218 (5th Cir. 1991). "[T]he board 'may exercise its powers only as a body at a meeting duly assembled and conducted.' " *Id.* (quoting *Curtis v. Pipelife Corp.*, 370 S.W.2d 764, 767 (Tex. Civ. App. 1963)). The record does not establish R.T. possessed individual authority to manage or bind the corporation. Thus, the Board has failed to prove by a convincing preponderance of the evidence that R.T. was a constituent of Care Initiatives who rule 32:4.2(a) protected from ex parte contact by Stowers.

For these reasons, we find Stowers violated rule 32:4.2(a) as to M.M. alone.

**C. Extortion.** The Board alleged Stowers's email to R.T. was a criminal extortion that violated rule 32:8.4(b). That rule provides that "it is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Iowa R. Prof'l Conduct 32:8.4(b). A person commits extortion by doing

> any of the following with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services:
>
> 1. Threatens to inflict physical injury on some person, or to commit any public offense.
> 2. Threatens to accuse another of a public offense.

3. Threatens to *expose any person to hatred, contempt, or ridicule.*

4. Threatens to *harm the credit or business or professional reputation of any person.*

5. Threatens to take or withhold action as a public officer or employee, or to cause some public official or employee to take or withhold action.

6. Threatens to testify or provide information or to withhold testimony or information with respect to another's legal claim or defense.

7. Threatens to wrongfully injure the property of another.

Iowa Code § 711.4 (2007) (emphasis added). The person making the threats has a defense to extortion if he "reasonably believed that [he] had a right to make such threats in order to recover property, or to receive compensation for property or services, or to recover a debt to which [he] has a good faith claim." *Id.* This statutory defense by its terms removes typical settlement demands and litigation threats from the ambit of the extortion statute.

The commission concluded Stowers did not violate the rule because the evidence failed to establish R.T. credibly perceived a legitimate threat of physical violence. Specifically, the commission reasoned:

> [D]espite the clearly threatening tone of the . . . email, this count of the complaint was substantially undermined by the testimony of [R.T.]. [R.T.] alleged that the primary threat he perceived was one of physical harm directed toward himself or his daughters. . . . [R.T.] specifically discounted the conjecture that the e-mail was a threat to sue him. This is consistent with [R.T.]'s failure to notify any authorities of a perceived threat, the absence of any discussion of extortion when the e-mail was brought to the attention of attorneys for Care Initiatives, and the lack of any reference to extortion when the ethics complaint was filed with the Board.

We defer to the commission's credibility finding that R.T.'s testimony concerning his fear of physical violence was not believable. But, the

commission focused too narrowly on section 711.4(1) governing threats of physical injury, to the exclusion of other grounds for extortion. We find the record establishes that Stowers threatened to subject R.T. to public ridicule and harm his professional reputation, and did so to obtain something of value for another—a charity chosen by Reis and Stowers—at a six-figure cost to R.T. Iowa Code § 711.4(3)–(4).

During the commission's hearing, Stowers testified repeatedly that he was acting as a husband and not as an attorney at the time he sent the email to R.T. demanding a charitable donation in his wife's name. Whether he was acting as a husband or an attorney is immaterial to determining whether his conduct violated rule 32:8.4(b) because lawyers are required to obey the disciplinary rules when acting pro se or in a personal capacity. *Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35 (Iowa 1990) ("[L]awyers do not shed their professional responsibility in their personal lives."). It is also important to note that rule 32:8.4(b) does not require a criminal conviction, but only that an attorney committed a "criminal act." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lustgraaf*, 792 N.W.2d 295, 299 (Iowa 2010) (holding respondent's failure to file tax returns in accordance with federal law was a violation of rule 32:8.4(b), even though he was never criminally charged); *see also Hall*, 463 N.W.2d at 33, 35 (holding respondent's commission of theft constituted violation of DR 1–102(A)(3), even though respondent was not charged with or convicted of a crime).

Accordingly, the absence of criminal charges, or even acquittal of criminal charges, is not a defense to this rule. 2 Geoffrey C. Hazard, Jr., et al., *The Law of Lawyering* § 65.4, at 65-10 (3d ed. Supp. 2009) [hereinafter Hazard]. The Board simply must prove the attorney committed the act by a convincing preponderance of the evidence.

*Weaver*, 812 N.W.2d at 9. "This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004). It is also a less stringent burden than clear and convincing evidence, which is "the highest civil law standard of proof." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996). Further, there must be a "rational connection" between the criminal act and the lawyer's fitness to practice law. *Weaver*, 812 N.W.2d at 11.

The elements of extortion are (1) an improper threat (2) for the purpose of obtaining for him or another (3) anything of value. *See State v. Crone*, 545 N.W.2d 267, 271 (Iowa 1996). "Threats need not be explicit; they may be made by innuendo or suggestion." *Id.* Stowers's email to R.T. does not overtly threaten to disclose disparaging nonpublic information, but the threat in context is at least implicit. Stowers tells R.T. to "focus on just two things . . . . 1) not getting yourself disbarred and indicted for fraud, and 2) preserving what may be left of your assets and already low reputation in the legal and lobbying community." The email goes on to say, "I want to give you the chance to resolve your dilemma without as much trauma to you as would occur if you do not accept the proposal I am about to make." This email conveys the message that if R.T. fails to do what Stowers demands of him, Stowers will take action to further harm R.T.'s reputation. The threat is reinforced by the email's final paragraph: "Don't doubt my resolve, ability to carry through, or intent to seek complete vindication." We find Stowers's email improperly threatens to injure R.T.'s professional reputation. *See* Iowa Code § 711.4(4).

The email also satisfies the second and third elements of extortion. The email demands that R.T. "make a personal cash donation to a charitable cause in the name of Jan Reis selected by Jan Reis and [Stowers] in an amount equal to all payments that [R.T. had] received from Care Initiatives from August 2005 to the present." R.T. testified the amount demanded exceeded $100,000. A $100,000 contribution constitutes something of "value" to "another," the charity, within the meaning of section 711.4.

Stowers contends there is no extortion because he reasonably believed he had the right to threaten R.T. in order to obtain a settlement for his loss of consortium resulting from R.T.'s sexual harassment and termination of Reis. *See id.* § 711.4 ("It is a defense to a charge of extortion that the person making a threat . . . reasonably believed that [he] had a right . . . to recover a debt to which the person has a good faith claim."). Stowers claims he was merely applying leverage to settle his consortium claim.[4] He relies on *Reis v. Walker*, 491 F.3d 868, 870 (8th Cir. 2007), which acknowledges that we have "repeatedly held that, because settlements are favored, commencing a lawsuit or adding a claim to gain leverage for a settlement . . . is not an abuse of that process."

---

[4]On July 1, 2005, we replaced the Iowa Code of Professional Responsibility for Lawyers with the Iowa Rules of Professional Conduct. Under the prior code, DR 7–105 stated "[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." Our new rules do not contain a similar proscription. The American Bar Association's Standing Committee on Ethics and Professional Responsibility advised this change was deliberate. ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 92-363 (1992). The model rules do not prevent a lawyer from presenting or threatening criminal charges to settle a case provided that the criminal charge is related to the civil matter, the lawyer has a reasonable belief both the civil claim and criminal charges are justified, and such an agreement itself is not a violation of the law. *Id.*

But, we are not persuaded Stowers sent his threatening email to R.T. to obtain a settlement of his consortium claim. Stowers never mentioned any consortium claim in his email to R.T. or other contemporaneous communications. It is difficult to believe an attorney attempting to settle a consortium claim would fail to even mention the claim when making demands. Indeed, Stowers lived through his wife's litigation and the settlement of her case without filing his own consortium claim against Care Initiatives or R.T. Interestingly, according to Stowers's own testimony, he drafted, but never filed, a petition setting forth his consortium claim on November 16, 2007, exactly two years to the day Care Initiatives terminated his wife.[5] As an experienced attorney, Stowers knew or reasonably should have known his consortium claim is subject to the two-year statute of limitations in Iowa Code section 614.1(2).

Thus, by the time Stowers sent the threatening emails in February 2008, any consortium claim he may have had arising from acts occurring up to his wife's termination was barred by the statute of limitations. *See Riniker v. Wilson*, 623 N.W.2d 220, 228 (Iowa Ct. App. 2000) (applying two-year statute of limitations to loss-of-consortium claim arising from sexual harassment and assault by former employer). For these reasons, on our de novo review, we find Stowers did not email R.T. to pursue settlement of a consortium claim. Accordingly, he is not protected by the defense to extortion in section 711.4.

Finally, we find a rational connection between Stowers's extortion and his fitness to practice law. *Weaver*, 812 N.W.2d at 11–12 (setting

---

[5]Whenever feasible, claims for loss of consortium should be joined with the injured spouse's claim. *See In re Estate of Sylvester*, 559 N.W.2d 285, 288 (Iowa 1997).

forth nexus factors); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767 (Iowa 2010) (same). The conduct was intentional and sought to vindicate a personal grudge. *See* 2 Hazard § 65.4, at 65-9 to 65-10 (stating a nexus often exists when the lawyer is "nursing a grudge"). Stowers's extortion threats used confidential information in contemptuous violation of a protective order. *Reis*, 787 N.W.2d at 70–71; *see also Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Miller*, 568 N.W.2d 665, 667 (Iowa 1997) (attorney's threats against her former employer using confidential information "bordered on extortion" and violated ethics rules).

For these reasons, we find Stowers violated rule 32:8.4(b).

**D. Actions Prejudicial to the Administration of Justice.** The Board alleged Stowers's conduct violated rule 32:8.4(d). Rule 32:8.4(d) states "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Conduct is prejudicial to the administration of justice when it impedes " 'the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.' " *Templeton*, 784 N.W.2d at 768 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 373 (Iowa 2005)). "The mere commission of a criminal act will not constitute a violation of rule 32:8.4(d) unless that conduct somehow impedes the operation of the justice system." *Lustgraaf*, 792 N.W.2d at 300.

The commission concluded the emails were prejudicial to the administration of justice because Stowers's "threat of public legal persecution in order to obtain a private benefit is clearly an abuse prejudicial to the administration of justice." We agree that Stowers's emails were prejudicial to the administration of justice.

Stowers's emails violated the protective order and triggered a series of unnecessary court proceedings, including rulings by the district court, court of appeals, and this court. *See Reis*, 787 N.W.2d at 64–65. This constituted conduct prejudicial to the administration of justice. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schall*, 814 N.W.2d 210, 214 (Iowa 2012) (holding attorney violated rule 32:8.4(d) because the misconduct caused unnecessary motions and court hearings); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 103 (Iowa 2012) (holding attorney's neglect of an estate was prejudicial to the administration of justice because it caused the district court to file seven delinquency notices). Accordingly, we find Stowers violated rule 32:8.4(d).

## IV. Sanction.

We determine appropriate sanctions in light of each case's particular circumstances, although prior cases are instructive. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kallsen*, 814 N.W.2d 233, 239 (Iowa 2012). In crafting a sanction,

> "we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances."

*Id.* (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 441 (Iowa 2012)).

Stowers's emails contemptuously violated a protective order by misusing confidential documents. He made an unauthorized ex parte contact with a constituent of an entity he knew was represented by counsel. He attempted to extort a $100,000 donation to a charity in his

wife's name. His actions that required contempt proceedings were prejudicial to the administration of justice.

We previously addressed the appropriate sanction for analogous misconduct when the attorney made improper demands on her former employer in response to an alleged wrongful discharge for whistle-blowing and sexual harassment. *Miller*, 568 N.W.2d at 667. Miller was employed as an attorney at Gekko when she discovered a fraud that potentially implicated company principles. *Id.* at 666. She came forward with the information over an officer's objection and was promptly terminated. *Id.* Miller, using confidential information she gained representing Gekko, demanded Gekko repurchase her 60,000 units in the company (the equivalent of corporate shares in a limited liability company) and 15,000 to 20,000 units owned by her friend at a price considerably higher than market value. *Id.* She also demanded Gekko dismiss its disciplinary charges against her. *Id.* She threatened to file a complaint with the Securities and Exchange Commission and pursue actions for sexual harassment and trade libel unless her demands were met. *Id.* Although Miller had a right under federal law to demand Gekko repurchase her units at her purchase price, she had no right to exact a price in excess of market value or force a repurchase for her friend. *Id.* at 667. We acknowledged Miller's conduct "bordered on extortion." *Id.* As here, the commission recommended a public reprimand for Miller. *Id.* at 666. But, we found "the seriousness of the violations require[d] a sanction greater than a public reprimand" and suspended Miller from the practice of law for sixty days. *Id.* at 667.

We next consider Stowers's other violations. Unauthorized communication with a represented party typically warrants a public reprimand. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Box*, 715 N.W.2d

758, 765 (Iowa 2006) (imposing public reprimand on attorney without prior disciplinary history because prohibited communication resulted in substantial harm and rejecting request to privately admonish respondent); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins*, 556 N.W.2d 456, 457 (Iowa 1996) (imposing public reprimand on attorney for contacting child witness in child abuse proceedings when attorney knew child would soon be appointed representation); *Comm. on Prof'l Ethics & Conduct v. Zimmermann*, 522 N.W.2d 619, 621 (Iowa 1994) (issuing admonition when attorney improperly interviewed child under a good-faith misinterpretation of a court order). *But see Schmidt*, 796 N.W.2d at 44–45 (imposing thirty-day suspension when attorney's unauthorized communication was combined with serious domestic abuse).

Sanctions for an attorney's violation of a court order vary in light of the accompanying misconduct. *See, e.g., Dunahoo*, 799 N.W.2d at 530–35 (imposing one-year suspension when attorney violated a bankruptcy court order, committed trust account violations, and neglected several clients); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hughes*, 557 N.W.2d 890, 895 (Iowa 1996) (imposing public reprimand when attorney advised client to ignore court order to obtain a substance abuse evaluation and declining to impose suspension because of the attorney's unblemished record and respectful and candid manner in dealing with the court); *Comm. on Prof'l Ethics & Conduct v. McCullough*, 465 N.W.2d 878, 886–87 (Iowa 1991) (suspending attorney's license for one year when counsel egregiously and flagrantly counseled client to violate court order).

Stowers points to several mitigating factors. He has performed significant court-appointed criminal defense work at reduced fees and

has served the state and federal courts through several criminal law committees and panels. *See Boles*, 808 N.W.2d at 442 (recognizing volunteer service to the community and legal profession is a mitigating factor). Stowers's character witnesses testified that his emails were an aberration from his normally professional conduct. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 589 (Iowa 2011) (stating a pattern of misconduct is an aggravating factor). Neither Stowers nor his wife profited from his ethical violations. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stein*, 603 N.W.2d 574, 576 (Iowa 1999) (noting lack of personal gain may be a mitigating factor).

We recognize Stowers's wife's contentious lawsuit involved deeply personal issues that took a heavy psychic toll on each of them and their marriage, which ended in divorce. *See Van Ginkel*, 809 N.W.2d at 110 ("[W]hile personal issues may be a factor in determining the appropriate sanction, they do not excuse ethical violations."). Yet, a lawyer in such circumstances should recognize the need to obtain and follow dispassionate, objective advice of counsel and "to be sensitive to circumstances which might impair his judgment." *Comm. on Prof'l Ethics & Conduct v. Hoffman*, 402 N.W.2d 449, 451 (Iowa 1987). Stowers had ample time to do so.

Minimizing or failing to take responsibility for one's misconduct is an aggravating factor. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire*, 689 N.W.2d 83, 93 (Iowa 2004) ("[T]he attorney's failure to appreciate the wrongfulness of his or her actions is an aggravating circumstance."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 686 (Iowa 2001) (noting the attorney "has continued to minimize his misconduct"). The commission observed Stowers was unable to "bring himself to admit that he had done anything

more than acted unprofessionally and did not sincerely concede anything was actually wrong beyond tenor and tone of the challenged e-mails." On our review of the hearing transcript, we agree with the commission. Stowers was defiant when asked if his conduct was inappropriate. The commission noted Stowers's "comportment" during the disciplinary hearing to be "unduly dismissive, disdainful, and derisive of all participants . . . displayed in the form of eye-rolling, sneers, and other non-verbal communication."

After careful consideration of the record, mitigating and aggravating factors, and precedent, we conclude a ninety-day suspension is appropriate.

## V. Conclusion.

We suspend Stowers's license to practice law in this state indefinitely with no possibility of reinstatement for ninety days. This suspension applies to all facets of the practice of law, as provided in Iowa Court Rule 35.13(3), and requires notification to clients, as outlined in rule 35.23. Upon application for reinstatement, Stowers must demonstrate that he has not practiced law during the period of his suspension and that he has complied with all of the requirements for reinstatement provided in rule 35.14. The costs of this proceeding are assessed against Stowers pursuant to rule 35.27(1).

**LICENSE SUSPENDED**.

All justices concur except Mansfield, J., who takes no part.